UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RICHARD ROBLES,

                    Petitioner,

     -vs-

ROBERT DENNISON, Chairman, N.Y.S.
Division
of Parole,

**No. 05-CV-0428(VEB)**
**DECISION AND ORDER**

## I.     Introduction

*Pro se* petitioner Richard Robles ("Robles"), by this petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, challenges the constitutionality of decisions of the New York State

Division of Parole ("the Parole Board") repeatedly denying him parole. (Docket No. 1). The

parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. §

636(c)(1).[1]

Robles was first committed to the New York State Department of Corrections on January

12, 1966, following a jury trial in New York County Supreme Court for two counts of first

degree murder. Robles initially was sentenced to a term of natural life in prison. However, in the

1970s, the New York State Legislature amended the law to make prisoners such as Robles

---

[1]      Respondent's attorney has pointed out Robles has incorrectly named the Chairman of the New York State Division of Parole as the respondent in this habeas action. The Second Circuit has held that "the Parole Board is not the 'custodian' of the prisoner, and therefore, in order to establish jurisdiction an action challenging parole procedures must be brought against the warden of the prison in which the petitioner is confined." *Billiteri v. United States Board of Parole*, 541 F.2d 938 (2d Cir.1976); *accord, e.g., Boddie v. New York State Div. of Parole*, 285 F. Supp.2d 421, 427 (S.D.N.Y. 2003). Although *Billiteri* involved federal prisoners, the doctrine applies equally to state prisoners. *See id.* Nevertheless, because Robles is petitioning *pro se*, the Court will treat the petition as if Robles properly had named the prison warden as respondent. *Accord Boddie*, 285 F. Supp.2d at 427.

eligible for parole after serving a minimum of twenty (20) years of his sentence.

According the papers submitted to this Court, Robles had his first parole hearing in November 1984. Since that time, Robles has appeared before the Parole Board every two years and, on each of these twelve (12) occasions, the Board has denied parole and ordered Robles held for another twenty-four months, the maximum time statutorily permitted between parole hearings.

Robles challenges a number of the Parole Board's decisions denying parole. Respondent has asserted the defense of non-exhaustion with regard to all of the denials except the 2002 denial, as to which respondent concedes that Robles has exhausted his administrative and state-court remedies. Thus, the key parole denial before the Court in the instant habeas petition is that rendered on May 7, 2002. The Parole Board denied release in a perfunctory decision with language remarkably similar to all of its previous denials, and ordered that Robles be held for another 24 months (the maximum hold time possible) before he would again be eligible for another parole hearing. Represented by counsel, Roble pursued an unsuccessful administrative appeal of the 2002 parole denial was unsuccessful. Robles' attorney then sought judicial review pursuant to Article 78 of the New York Civil Practice Law and Rules ("C.P.L.R.") New York State Supreme Court, Wyoming County. The county court judge denied the petition in a written decision and order. The Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed the decision on appeal. *Robles v. Travis*, 9 A.D.3d 919 (N.Y. App. Div. Dept. 2004). The New York Court of Appeals denied leave to appeal on October 21, 2004. *Robles v. Travis*, 3 N.Y.3d 610 (N.Y. 2004).

On May 4, 2004, and again May 9, 2006, the Parole Division again denied Robles parole

release. This Court recently has received correspondence from Robles indicating that his most recent parole hearing, held on May 8, 2008, resulted in, unsurprisingly, another denial of release.

Robles commenced this habeas proceeding on April 5, 2005, pursuant to 28 U.S.C. § 2254, alleging that the Parole Division's decisions denying him parole violated the *Ex Post Facto* Clause, Due Process Clause, and Equal Protection Clause of the United States Constitution.

The Court dismissed respondent's pre-answer motion to dismiss, and ordered respondent to answer the petition. After receiving respondent's answer and memorandum of law, and Robles' reply brief, the Court requested additional information from the parties concerning, e.g., the specifics of the parole denials.

For the reasons that follow, the request for a writ of habeas corpus is denied and the petition is dismissed.

## II.    Factual Background and Procedural History

### A.    The Underlying Conviction and Post-Conviction Proceedings

In the late morning of August of 1963, while under parole supervision for a second-degree assault conviction, Robles entered an apartment in Manhattan through a window with the intent of burglarizing it. Once inside the apartment, which he thought was unoccupied, he encountered a young woman, who was in bed, sleeping. Robles forced the woman to perform oral sex on him; he then attempted to have anal intercourse with her but she asked him to stop. At about that time, one of the woman's roommates entered the apartment. Robles bound them both and tied them up together. The second woman told Robles that she would remember his face and would make sure that the police caught him. At that point, Robles would later explain, he "snapped" and began striking the women with soda bottles, rendering them unconscious. He

then stabbed them repeatedly with kitchen knives, killing them both. *See* Respondent's Exhibit ("Resp't Ex.") CC at 2-7.[2] The women's bodies were later discovered by the third roommate and the father of one of the victims.

Following a jury trial, Robles was convicted of two counts of first degree murder. He was sentenced in 1966 to term of life in prison. *See* Resp't Ex. B. Following a change in New York's penal law, Robles was re-sentenced in the 1970s to an indeterminate term of imprisonment of twenty (20) years to life. *See* Resp't Ex. C at p. 2.

On May 8, 1969, the Appellate Division, First Department, of New York State Supreme Court unanimously affirmed Robles' conviction but did not issue any opinion in connection therewith. *People v. Robles*, 32 A.D.2d 741 (N.Y. App. Div. 1969). The New York Court of Appeals granted leave to appeal. The conviction was affirmed by a five-to-two divided panel on September 24, 1970. *People v. Robles*, 27 N.Y.2d 155 (N.Y. 1970).[3] The Supreme Court denied *certiorari*. *People v. Robles*, 401 U.S. 945 (1971). The New York Court of Appeals subsequently denied Robles' motion for reargument.

### B.     Proceedings before the Parole Board

Beginning on November 5, 1984, the Parole Division periodically interviewed Robles pursuant to New York Executive Law ("Executive Law") § 259-i to determine his suitability for

---

[2]     Citations to "Respondent's Exhibits" ("Resp't Ex.") refer to the documents annexed to the Declaration in Opposition to the Petition submitted by respondent.

[3]     Judge Burke issued the affirming opinion, in which four judges joined; Judge Breitel dissented and voted to reverse in an opinion in which Chief Judge Fuld concurred in a separate opinion. The contentious issue was whether Robles' confession was improperly admitted pursuant to a New York State rule regarding the State constitutional right to counsel as set forth in *People v. Arthur*, 22 N.Y.2d 325, 329, which held that "[o]nce an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel. There is no requirement that the attorney or the defendant request the police to respect this right of the defendant."

parole release. As detailed more fully below, parole was denied in each instance.

### 1. The 1984 Parole Denial

Prior to Robles' first parole hearing, Dr. Mayeed Rahman, a psychiatrist at Auburn

Correctional Facility, examined Robles. Dr. Rahman issued a report containing the following

conclusion:

> On the basis of the interview and perusal of his records, the inmate does not
> appear to be mentally ill or dangerous at the present time. He has realistic plans
> for the future. I do not see any psychiatric contraindication to his release in the
> society at this time. However, he should continue to participate in some
> counselling [sic] in order to maintain the progress he has made during the period
> of his incarceration.

Petitioner's Exhibit ("Pet'r Ex.") I-1.

Following a hearing, the Parole Board denied parole in the following decision:

> Parole denied. Hold 24 months with a psych. [sic] (11/86 Bd.)
> Based on the nature and circumstances of the current offenses, two counts of
> murder in the first degree, wherein two young women were stabbed to death –
> one sexually abused, and her naked body tied to the clothed body of the other
> victim. You were convicted by jury trial and although you deny the allegations,
> your appeals have been denied.
>
> Note is made of your reduction of natural life sentence through Chapters 343 and
> 344, to twenty years to life. Your institutional record is extremely satisfactory as
> to program participation. *However, the gravity of the instant offense precludes
> release consideration.*
>
> Continue in constructive institutional programming. Statutory limitations
> preclude a longer hold. Guidelines are unspecified.

*See* Resp't Ex. E (emphasis supplied). The Parole Board did not make any mention of Dr.

Rahman's positive mental health evaluation of Robles, and his favorable opinion that Robles did

not pose a future threat of dangerousness. Rather, the Parole Board relied solely on the nature of

Robles' crime to justify their decision to deny release.

## 2. The 1986 Parole Denial

Two years later, Robles had his second parole hearing. At the beginning of this hearing, Commissioner Mulhulland, one of the board members noted that Robles now had accepted responsibility for the offense, and complimented him:

> In the institution I guess we couldn't have a much better inmate. You have been with us for 22 years. Haven't had a ticket in the last 10 years. . . . You appear to be well liked by the inmates . . . . I have not found anything negative about you in here . . . .

*See* Transcript of 1986 Parole Hearing, Resp't Ex. F. Robles then was asked to talk about the crime. He related his actions on the morning of the burglary in a vivid narrative without any prompting. Robles talked about how when he first came to prison, telling the Parole Board that he was "a drug addict" filled with "[s]elf-loathing", "destroying his own life and other lives." He said that he "hated [him]self" at the time and explained the emotional difficulties he experienced growing up in an alcoholic family. Robles talked about how he "turned [his] feeling about [him]self around" as he "saw [him]self helping people" through his involvement in, for example, the inmate's Liaison Committee and working with David Rothenburg of the Fortune Society. *See id.* Robles explained that he had gotten an education, and wished to pursue teaching art (he had taught both art and photography while in prison). He believed that he was a different person than he was 22 years ago, and the change was the result of helping himself by helping others. *See id.* The Parole Board's only question of Robles was a hypothetical: "what would be the sanctions be for . . . taking two other lives[?]" Robles answered that "[u]ntil this man is safe to release I would have to keep him locked up." There were no further questions from the Parole Board.

Parole Board Chairman Rodriguez commented, "You have acquitted yourself well. You have been your own best advocate. This case is going to be a tough one to decide." *Id.* Robles acknowledged that. The chairman continued,

> It's a rough one. We have to play with it and talk about it. . . . It's a real rough one. We could hold you for two years easily. We could look at you and make a decision [redacted] and let the next Board look at you under our rules. We can do a [sic] myriad of other things. But you are clearly someone who has advanced considerably in the years you have been in jail. You have helped yourself and helped other people. Ken Jackson and Dave Rothenburg have helped a lot of other people also . . .
> I know them. They are good people. I am sure they helped you a lot. You help them. We have a person who did something terrible 22 years ago that was horrible. We have to work on what we think is the right thing to do. You want to leave us with a final comment?

*Id.* To this question, Robles replied, "I am sure killing is terrible. What I did no doubt about it. I have lived with it a long time. It hurts. In my heart I know I did not maliciously kill. Not insanity, but close to it; that it wasn't malicious." *Id.*

The parole commissioners denied parole in a summary decision, without giving any basis for their ruling; they merely ordered Robles held for "two months or earlier for a special psychiatric procedure." *See* 1986 Parole Denial, Resp't Ex. G.

### 3. The 1987 Parole Denial

Robles underwent the required psychiatric evaluation, and his reappearance before the Parole Board occurred on January 16, 1987. The parole commissioners focused on Robles' previous criminal history which they described as "extremely disturbing," as well as the gruesome details of the crime for which he presently was incarcerated. *See* Transcript of 1987 Parole Hearing, Resp't Ex. H.

The Parole Board focused on his criminal history prior to the double murder,

commenting that the time of his arrest he "admitted to about 89 or 100 other burglaries and/or robberies of occupied apartments during the period of July 1959 through January of 1960. During one of these burglaries a woman, who was in the apartment, was apparently shot. Wounded. There was a person whom you must have been involved with that received stolen property from you who was also shot and wounded because that person threatened to turn you into the police. So, I mean, you have already established a pattern of this type of behavior. . . . [Y]ou were paroled June the 3rd of 1963 and on August the 28th of 1963 you committed this crime. Following the exact same pattern you had followed in the past. . . ." Resp't Ex. H.

Robles attempted to explain why he did not admit to the stabbings earlier, stating that in 1984, when he first came up for parole, there were several prisoners at Auburn killed. Robles said he was being threatened by other inmates at the time. When he explained the situation to his attorney, he was told that he could maintain his innocence, "on advice of counsel". Robles said that he "jumped on" that advice because he "felt threatened" by the situation at the prison, and admitted that it "was callousness" on his part to maintain his innocence.

Commissioner Buchanan criticized Robles for maintaining his innocence up until recently, and commented that the "tremendous amount of therapy" in which he had been involved was "totally valueless. As long as you were denying the crime, the therapy could not in anyway [sic] relate to the crime" Resp't Ex. H at 11. Robles conceded the point, a factor which the Parole Appeals Unit focused on when upholding the denial of parole. *Id.* Robles explained that in 1984, he was still mentally "sick," suffering the after-effects of watching his alcoholic

father beat his mother when he was a child.  Robles told the parole commissioners that the therapy essentially did not "click" until he got help in addressing the after-effects of growing up in that environment, which caused him to be overly sensitive to criticism, and to "do crazy things which is what this burglary and what [his] drug uses [sic] was about." *Id.* at 12-14.

On his own initiative, Robles then discussed the underlying facts of the murders.

> The day before this crime occurred my daughter was on the toilet bowl that was broken. I just moved my woman, my daughter into an apartment trying to be a macho man and all this image. She was on the toilet seat that was broken and it slipped and she hurt herself and I felt about this big. Very, very small. That was the catalyst that started me thinking about burglary. I had stayed away from drugs. I drank. I substituted.
> . . .
> I got in there [and] Janice Wylie [was a]. . . total surprise. I didn't expect anybody. I knocked on the door. I looked under the door. I rang the bell. I had no idea anybody was in there. When I got in there she was in there and . . . thoughts hurt. They hurt. I'm really ashamed of this
> . . .
> I've been working on this 2 months. I don't want to desensitize myself to this because I want to remember this is a terrible crime. I want to feel pain. I don't know if it makes any sense to you, but I want to feel pain. Some things I want to feel pain about and some things I do. This shows how sick I was also. How really messed up to me to tell me how messed up I was. I looked at this woman and I started thinking don't I wish I had a woman like this and the world could just be lovey dovey. I attempted to have sexual intercourse with her. She asked me not to and I did, in fact, stop. I tied her up and as I was leaving – " Resp't Ex. H at 18-19.

At that point, the Parole Board questioned Robles about whether he felt a feeling of "strength and power that this woman would become scared because of [him] now that [he] had this power?" *Id.* Robles admitted that this could have been the case, but stated that he was "not conscious of it" at the time. *Id.* at 19.

Robles continued his explanation: Wylie's roommate came in, and he tied her up too so neither woman would call the police. Robles said that he was "just about going out the door and

[the second woman] said, I'm going to remember your fact [sic]. I'm going to tell the police on you." *Id.* at 21. Robles told the Parole Board, "I was anxious before that, but at that point, I more or less, snapped." *Id.*; *see also id.* at 21-23. Robles said, "[w]hat happened to me in that apartment . . . maybe it's not enough for a court of law because it's a criminal felony act. Not enough for a court of law, but it was clinical insanity that occurred that day to me. In my heart I know this." *Id.* at 25.

Robles indicated that in the years that he had been in prison, he had initiated a Narcotics Anonymous group, and "[v]arious TA [transactional analysis therapy] groups," as well as a computer club. *Id.* He also had 57 credits towards an associate's degree, and had pursued courses in welding, electronics, and was, as the parole commissioner noted, "a very skilled artist." *Id.* at 26. Robles explained that it had been his "plan to help when I get out, to help others." He had been offered a job at the Fortune Society two years ago, but had been unable to accept because he was denied parole. *Id.* Robles explained that he "wanted to become familiar with various trades . . . so I could help advise youths . . . ." He discussed his conversion from Roman Catholicism to the Quaker religion. *Id.* at 26-27. He also talked about his fiancée of ten years, who was a foster parent, and he was aware that he would not be able to live with her if she elected to continue to be care for foster children. *Id.* at 28-29 Robles also discussed his only daughter, who was twenty-seven years-old in 1987; he said that he had been writing to her since he became incarcerated, and recently they had started talking on the phone; he also talked to his son-in-law, but had not met his grandchildren. Robles noted that it was "a shaky relationship" but he "want[ed] to develop it." *Id.*

When asked if he had anything further he wanted to discuss, Robles said "[r]emorse." *Id.*

at 30. He talked about the horror and disgust with himself he felt after the stabbings, and said he "started hating [him]self from that moment." Robles explained that he painted as a way to deal with the feelings and nightmares he has had. *Id.* at 31. The Parole Board asked why, if he felt that way, did he not turn himself in to the police immediately after the incident, and then questioned Robles about the fact that he was not arrested until an informant, who was supplying him with drugs, tape-recorded a conversation in which Robles incriminated himself. *Id.* at 31-35. Robles acknowledged those things, and explained that he was essentially imprisoned in his drug addiction to heroin. *Id.* at 36-37.

Based on the Parole Board's questions and comments during the hearing, it became clear that they viewed everything Robles said with skepticism. They also apparently did not believe he had sufficiently internalized responsibility for his crime, which admittedly was heinous, since he did not start discussing the crime in therapy until several years beforehand. Thus, their terse denial was not a surprise:

> Parole denied. Hold 24 months, 11/88 Board. With mental health status report. Reasons for denial: Denial is based on the *nature and circumstances of the current offenses, 2 counts of Murder 1°, wherein 2 young women were brutally stabbed to death, one sexually abused and her naked body tied to the clothed body of the other victim.*
> Denial of this crime has been consistent through 1984 and according to you on your attorney's advise. Recently, you have begun to admit the crime. Throughout this period of incarceration you have been exposed to periods of extensive therapy related to your personal needs, however, not dealing with your criminal acts. Note is made of your institutional efforts and achievements. *Given the nature of the crime and the prior criminal history* discretionary release cannot be considered. Statutory limitations preclude a longer hold.

*See* Resp't Ex. H at 38 (emphases supplied). Again, the Parole Board's denial rested principally on the severity of the crime.

-11-

### 4. The 1988 Parole Denial

The transcript of the 1988 hearing has not been provided as part of the state court records

in this case. The decision issued reads as follows:

> Parole is again denied by this panel of the Board of Parole after careful review of
> your records and an interview. *Your offense involves the brutal murder of two
> women in their home in the course of a burglary in which you were interrupted.
> You tied the unclothed body of one of the victims to the clothed body of the other
> after having sexually abused her. You were on parole supervision when this crime
> occurred.* While the progress and accomplishments you have achieved while
> incarcerated, particularly in the last several years, are noted, it is the judgment of
> this panel that parole should be denied at this time.

*See* 1988 Parole Denial Resp't Ex. K (emphasis supplied). The Parole Board's decision thus was

based solely on the nature of Robles' offense. Robles was ordered held for another 24 months.

*See id.*

### 5. The 1990 Parole Denial

The transcript of his hearing is not available for review. The decision denying parole

states in full as follows:

> Again, this panel believes there is a possibility of reversion to crime if released.
> *So violent was your murder of two women during the commission of a burglary
> while on parole for three months, that it does not offset the exceptional
> contributions you have made during these 26 years of imprisonment.* You cite in
> your presentation the fear of ever putting yourself in an unpredictable situation
> and, as those life situations are a reality, we believe your community release is not
> in the best interests of society.

*See* 1990 Parole Denial, Resp't Ex. L (emphasis supplied). Once again , the Parole Board's

denial reflected its finding that the gravity of Robles' crime to trump all other positive factors.

Robles was given the maximum hold time and the next hearing date was set for November 1992.

*See id.* His administrative appeal was unsuccessful. *See* Resp't Ex. M.

### 6.    The 1992 Parole Denial

This transcript also is not available for review. The decision denying parole issued by this panel was quite cursory:

> *The extreme gravity of the instant offense, the wanton murder of two young women during the course of a burglary, precludes early release. The inmate was on parole at the time of the commission of this crime.* The inmate has an outstanding institutional adjustment and we have *attempted* to consider that fact in our recommendation.

*See* Resp't Ex. N (emphases supplied). Again, the Parole Board denied release based entirely on the severity of the crime. Robles was ordered held for 18 months. *See id.* It appears that Robles requested a postponement of three months because there were legal matters that he wanted to resolve before reappearing before the Parole Division.  *See* Resp't Ex. O.

### 7.    The 1994 Parole Denial

The next full parole hearing was held on July 12, 1994, at which point Robles had been incarcerated for 29 ½  years. He was 51 years-old at the time of the interview. When asked if he was "hostile about what the system" had done to him, "or where society ha[d] determined [he] belong[ed]" Robles responded, "I was dangerous, I was a time bomb, a ticking time bomb," and "what has happened to me . . . society has to put people away that are dangerous, it is as simple as that." Resp't Ex. P at 7-8. Robles explained that "[a]nything that occurred was threatening to [him], anything negative that occurred was threatening," and he expressed those feelings "[w]ith drugs." *Id.* at 8. The Parole Board noted that he had "had extensive substance abuse counseling" since his incarceration. *Id.*

The Parole Board asked when he was able to internalize his guilt, i.e., accept

responsibility. Robles explained when and how he was able to acknowledge responsibility for the crimes, in 1985 or 1986, during his participation in transactional analysis therapy. The Parole Board appeared view Robles' crimes as primarily sexual in nature; they asked if there was "[a]ny particular reason" why the two victims were women. *Id.* at 9. Robles responded, "They were – I was in the wrong place at the wrong time, you know." *Id.* When pressed on what this meant, Robles said, "I didn't pick women, okay. They were just there. It was a burglary." Resp't Ex. P at 10. The Parole Board questioned Robles intensely on what he meant by being in the wrong place at the wrong time, noting, "It suggests to us, perhaps, that even though you have acknowledged responsibility, you might still be struggling with your internalization of guilt. Does it occur that way to you." *Id.* at 10. Robles replied, "No, it hadn't occurred that way to me. Perhaps I picked the wrong term, the terminology. It is just a phrase." *Id.*

The topic of the hearing turned to the programs Robles had been in to help him "gain insight into the extreme violence that was displayed in [his] crime." *Id.* at 11. Robles explained that he had participated in the Alternatives to Violence Program, Aggression Replacement Therapy, and also had been seeing a psychologist, who was then deceased. *Id.*

Robles had been married for three years to a woman in Saugerties, New York, who was a foster parent to five children. Robles explained that he had been accepted into the Cephas Program in Rochester, New York, a "structured release program" that had "everything." *Id.* at 12.

Robles then asked permission to read a prepared statement. Robles stated that he had "a tremendous amount of empathy for them as a result of the fact that I, myself, have been a victim of numerous criminal acts and, thereby, likewise, suffered the torment of a crime victim. Those crimes include the death of my brother in a criminally- negligent tragedy." Resp't Ex. P at 14.

After Robles finished his statement, which also touched on the challenges he had faced while in the prison system, and his letters of commendation, Commissioner Platt noted,

> The record says that you have made an excellent adjustment. You have done extremely well as an inmate. You have participated in academic and vocational and therapeutic programs. You seem to have a viable release plan, you have done well. There is something that you said earlier, though, that concerns me, that is, you see yourself as a crime victim.

Resp't Ex. P at 17. Robles explained, as he had in prior parole hearings, that when he was he was 11 or 12 years-old, he lived in an Irish-German neighborhood, and would get "jumped" by other students at his school who called him a "spic bastard" and cut with a knife in his neck and arm, and threatened to kill him. *Id.* at 17-18. Robles felt, as a result of his therapy, there was a strong relationship between what happened to him and his criminal acts. *Id.* Robles also saw himself as a relative of a crime victim, because he felt that his brother, who died in a parachuting accident while serving in the armed forces, had been the victim of criminally negligent homicide. *Id.* at 18-19.

When asked what kind of thoughts came to mind when he contemplated his two victims, Robles replied, "It never had to happen." *Id.* at 20. Apparently, dissatisfied with this response ("That's the only thought that comes to mind?"), the panel asked if he had thought about the fact that he had deprived them of life and the pursuit of their goals; Robles responded affirmatively. *Id.* Robles tried to explain that what he meant by "it never had to happen" was that the incident had started as a burglary and had escalated. Robles' response was cut short by one of the commissioners, who noted that Roble had "done well" and "present[s] [him]self well . . . ." *Id.* at 21. The commissioner noted that because of the nature of the crime, the Board was required to "invoke the special psychiatric panel procedures." The commissioner further stated after

reviewing the mental status reports prepared on Robles, the Parole Board had found that they did

"not provide any contraindication to [his] release." *Id.* at 21.

Despite all of these favorable factors, this panel also denied parole and ordered Robles

held for another 24 months in the following decision:

> Following a thorough review of your record, a personal interview and
> deliberations by this Panel, we render the following decision: Parole is denied. At
> the interview, it was apparent that despite your participating in counseling and
> therapeutic programs, you have failed to fully internalize culpability for your
> criminal behavior. Though you verbalize remorse, you continue to struggle with
> acceptance of responsibility for your conduct. You presented various
> rationalizations for your behavior, and continue to self-identify as a crime victim.
> You are comfortable with shifting the genesis of your criminal behavior to
> causative factors and entities external to yourself. No genuine remorse or
> compassion or compassion [sic] for the victims was ascertainable.

> You denied culpability for many years, and it appears that your superficial
> acceptance of responsibility in later years was intended more to impress this
> Board than as a true expression of your rehabilitative progress.

> Your crime was truly heinous, representing a gross decompensation of human
> values. Extensive rehabilitative and incarcerative measures are appropriate. Your
> exceptional custodial adjustment and pragmatic [sic] achievements are noted.

> Guidelines are unspecified.

> (All Commissioners present concur.)

Resp't Ex. Q at 23-24; *see also* Resp't Ex. R.

The Appeals Unit upheld the parole denial in the following decision:

> There is no entitlement to release, and release may only be granted where the
> Board has no reason to believe that the inmate could remain in the community
> without violating the law. The record of this proceeding clearly indicates that the
> panel discussed and considered the factors pertinent to the issues of release,
> including his criminality, institutional adjustment and release plans, as well as his
> attitude and statements as expressed during the interview. Therefore, the panel,
> having considered the statutorily appropriate factors, could rationally predict, for
> the reasons it stated in its decision, that release would be incompatible with the

welfare of society.

Resp't Ex. S.[4]

### 8. The 1996 Parole Denial

Robles' next parole hearing was conducted on May 1, 1996. *See* Resp't Ex. T. The panel

orally rendered their decision denying parole at the close of the hearing, after Robles had been

excused:

> [Parole is] Denied. [Hold for] 24 months. [Reappearance in] May '98.
>
> Originally sentenced to term of life imprisonment (which did[,] under the law at that time[,] provide for the possibility of parole consideration) as the result of your conviction by verdict for the stabbing deaths during August 1963 of two women in their New York City apartment, your sentences subsequently were modified by legislative changes to 20 years to life, making you originally eligible for parole during January 1985.
>
> Several Parole Board appearances are noted since the end of 1984. On parole at the time of the August 1963 homicides for about three months, you were not arrested until January 1965. In between, you had been returned to prison for parole violation and then reparoled. Your prior DOCS term as a Y.O. was imposed in 1960 and was related to similar behavior that led to your current incarceration for homicide in that the earlier criminal behavior involved residential burglaries that at times included accosting and threatening victims in their homes.
>
> *In the August 1963 crime, you encountered two young women in their apartment, bound them to each other and viciously stabbed your immobilized victims. Previously you had forced sexual contact upon one of the victims. Your multiple stabbing of both victims while they were bound suggests a rage and uncontrolled anger that, along with your previously-established pattern of willingness to risk confronting victims in their homes is of great concern to us.*
>
> We note your extremely positive adjustment as an inmate in terms of behavior and program efforts, and we note your plans for release and the availability of support

---

[4]         As an aside, the Court notes that in comparing the Parole Board's decision with Appeals Unit's decision, it is apparent that the latter had little to nothing to do with the former. That is, the Appeals Unit ascribed certain reasoning to the 1994 Parole Board which is neither apparent from the face of, nor implicit in, the Parole Board's decision denying release nor the transcript of the hearing.

in the community. We also note your age and the length of your confinement. *Still, given the other factors cited above, we are concerned that return to the community entails too great a risk of return to the negative behavior that led to the 1963 brutalization and deaths of two young women.*

Guidelines are unspecified in this case.

*See* Resp't Ex. T at 26-27 (emphases supplied); *see also* Resp't Ex. U.

### 9. The 1998 Parole Denial

Robles next parole hearing was held on April 29, 1998. *See* Resp't Ex. Y. At the beginning of the hearing, Commissioner Graber astutely commented, "33 years is a long time to be in jail." Resp't Ex. W at 7. The commissioners spent much of the hearing focused the details of the crime, questioning Robles at length about the nature of the sexual contact between him and the first victim. The commissioners described the offense as an "awful brutal crime, two women tied together, helpless," and asked him why he had done that.

The panel issued a decision on the record after Robles left the hearing:

[Hold for] 24 months. [Re-hearing in] 5/2000. Instant convictions for murder first are very serious. Two young women were brutally stabbed to death. One was sexually abused and her naked body tied to the clothed victim. Both women were bound by the feet and wrists. While they were tied they were stabbed to death. Instant conviction is heinous and represents a depraved indifference towards human life. Two women were tied up, rendered helpless, then they were brutally killed.

Discretionary release in light of the aforementioned factors, has been determined to be incompatible with the public welfare. Further, discretionary release would deprecate the gravity and seriousness of the crime. This determination has been made after a review of your entire case file and in consideration of today's interview.

Finally, it is noted that you were under parole supervision when instantly [sic] involved. We note your accomplishments while incarcerated, and they have been considered when arriving at today's decision.

*See* Resp't Ex. W at 25; *see also* Resp't Ex. X; Pet'r Ex. 6-8.

Robles appealed this adverse determination to the prison appeals unit on the bases that his due process rights were violated, that the application of Executive Law § 259-i was a violation of the *ex post facto* clause, and that the Parole Board was improperly influenced by public pressure opposing his release.

### 10.    The 2000 Parole Denial

Robles appeared before the Parole Board again on April 26, 2000. The decision denying release read as follows:

> Parole Decision: Denied – Hold for 24 months, next appearance date: 05/2000.

> Conditions of Release/Reasons for Denial: Parole is again denied due to the violent and heinous nature of the I.O. [instant offense], murder 1st (2 counts), wherein you raped and sodomized one victim and stabbed to death two defenseless women.

> We note all your positive programming throughout the years and community support but find more compelling, your total disregard for the life of others.

> Comments:  Following deliberation, this decision is based on review of the case record as well as the interview with parole board members.

Pet'r Ex. S-9.  Again, the Parole Board based its denial on the nature of Robles' crimes.

### 11.    The 2002 Parole Denial

Robles' next appearance was on May 7, 2002. The decision denying parole read as follows:

> Parole Decision: Denied – Hold for 24 months, next appearance date: 05/2004

> Conditions of Release/Staff Instructions/Reasons for Denial:  After a careful review, parole is again denied. Your conduct in committing this vicious crime of murder (2 counts): You illegally entered the female victim's apartment where you forced her to commit an act of oral sodomy on yourself. Subsequently, another

-19-

female arrived. Both were tied with bed sheets and you stabbed and killed them. Your record reflects other criminal conduct on your part with a parole failure.

Your overall conduct leads the panel to conclude your release would make a mockery of the criminal justice system, therefore, you are not an acceptable candidate for discretionary release. Your were on parole supervision at the time you committed the instant offense.

Comments:  Following deliberation, this decision is based on review of the case record as well as the interview with parole board members.

Pet'r Ex. S-10. The Parole Board once more based its denial on the nature of Robles' crimes, and

did not even mention any positive factors, such as his rehabilitation efforts, in its decision.

### 12.     The 2004 Parole Denial

The decision denying parole after the May 2004 hearing read as follows:

Parole Decision: Denied – Hold for 24 months, next appearance date: 05/2006

Conditions of Release/Staff Instructions/Reasons for Denial: Parole is denied. You continue to serve 20 years to life for two counts of murder. This involved you causing the death of two female victims who were brutally and repeatedly stabbed inside their apartment. While the panel notes your positive program adjustment, due to the extremely serious and violent nature of these crimes, the panel concludes that your release would not be appropriate at this time.

Comments: Following deliberation, this decision is based on review of the case record as well as the interview with parole board members.

Pet'r Ex. S-11. Again, the Parole Board based its denial on the nature of Robles' crimes.

### 13.     The 2006 Parole Denial

Robles' next appearance was in May of 2006. The decision denying parole read as

follows:

Parole Decision: Denied – Hold for 24 months, next appearance date: 05/2008

Conditions of Release/Staff Instructions/Reasons for Denial: After a review of the record and interview, the Panel has determined that if released at this time, there is

a reasonable probability that you would not live and remain at liberty without again violating the law. Your release at this time would be incompatible with the welfare of society and would so deprecate the serious nature of the crime as to undermine respect for the law. This decision is based on the following factors. Your instant offense is murder (2 counts) in which you, while committing one of your many burglaries, sexually assaulted one victim at knifepoint and then a second victim entered the apartment, you tied up both victims and after one victim stated she would remember you and have you arrested you mercilessly beat and repeatedly stabbed your two helpless, unarmed, tied up victims in such an excessively brutal and viscious [sic] manner you broke several knives killing them, while on numerous occasions denied your guilt and allowed an innocent man to take the blame for your evil crime. The incredibly heinous and brutal nature of your offenses, and your past criminal behavior clearly indicate you are a poor candidate for release. Note is made of your programming and clean disciplinary record. Parole is denied.

Pet'r Ex. S-12. The Parole Board, once again, based its denial on the nature of Robles' crimes.

### C. The Exhaustion of State Court Remedies and Petitioner's Administrative and Judicial Appeals at the State Level

A prisoner challenging his custody pursuant to a conviction in state court must first exhaust all state-court remedies "unless state corrective process is unavailable or the process that is available would be ineffective." *Scales v. New York State Division of Parole*, 396 F. Supp.2d 423, 428 (S.D.N.Y. 2005) (citing 28 U.S.C. § 2254(b)(1)). Nevertheless, a federal court may entertain a petition for a writ of habeas corpus if "it appears that (i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B). Pursuant to the 1996 amendments to the habeas statute, "[a]n application for a writ of habeas corpus may be *denied* on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(2) (emphasis supplied).

In order to exhaust claims stemming from a denial of parole under New York law, a

habeas petitioner must first file an administrative appeal with the Division of Parole's Appeals Unit. *Morel v. Thomas*, No. 02 CV 9622(HB), 2003 WL 21488017, at *2 n.3 (S.D.N.Y. June 26, 2003) (citing N.Y. COMP. CODES. R. & REGS. tit. 9, § 8006.1). If that appeal is denied, he must seek relief in New York State Supreme Court pursuant to Article 78 of New York's Civil Practice Law and Rules ("C.P.L.R."). *Id.* (citing *Desire v. New York Division of Parole*, 2001 U.S. Dist. LEXIS 13784, at *6 (S.D.N.Y. Aug. 22, 2001)); *see also Scales*, 396 F. Supp.2d at 428 (describing steps habeas petitioner must take in order to exhaust claim of erroneous parole revocation). Assuming his Article 78 petition is denied by a justice of the Supreme Court, the inmate must then appeal the denial to New York's intermediate appellate court, the Appellate Division. *See Morel*, 2003 WL 21488017, at *2 n. 3 ("Morel did appeal his denial to the Appeals Unit, and he also filed an appeal in New York Supreme Court pursuant to Article 78. Yet, he did not appeal the denial rendered by Justice Cobb to the Appeals Division of the state court. Thus, he failed to fully exhaust the state remedies available to him; Morel concedes this fact.") (citation to record omitted).

Respondent argues that the 2002 parole denial is the only Parole Board decision as to which Robles has exhausted his state court remedies by completing one full found of New York's established review procedures. The Court agrees that Robles has fully exhausted his state court remedies with regard to the 2002 parole denial.

With regard to the other parole decisions, the exhaustion issue is more complicated. Robles contends that the process for appealing a parole denial is ineffective because he will be eligible for a new hearing before he has exhausted his appeal, and thus his appeal will be moot. *See, e.g., Morel v. Thomas*, 2003 WL 21488017, at *2 (inmate denied parole made these

arguments in response to respondent's assertion of non-exhaustion of claims) (citing *Brown v. Thomas*, No. 02 Civ. 9257, 2003 WL 941940, at *1 (S.D.N.Y. Mar. 10, 2003); *Defino v. Thomas*, No. 02 Civ. 7413, 2003 WL 40502, at *3 (S.D.N.Y. Jan. 2, 2003); *Hairston v. Thomas*, 2003 U.S. Dist. LEXIS 5020 (S.D.N.Y. Mar. 31, 2003);  *Manley v. Thomas*, 2003 WL 1739003 (S.D.N.Y. Apr. 1, 2003)). Robles also contends that the state remedy is ineffective because the only remedy available to him is a *de novo* hearing before the Parole Board.

I note that a number of other New York state prisoners have raised essentially the same argument in their § 2254 habeas petitions challenging decisions by the New York Division of Parole–namely, that the futility of the state court procedures for obtaining meaningful review of the Parole Board's actions constitutes circumstances "that render such process ineffective to protect the rights of the applicant," 28 U.S .C. § 2254(b)(1)(B)(ii). *See Brown v. Thomas*, No. 02 Civ. 9257, 2003 WL 941940, at *1 (S.D.N.Y. Mar. 10, 2003); *Washington v. Thomas*, No. 03 Civ. 363, 2003 WL 21262089, S.D.N.Y. May 29, 2003); *Defino v. Thomas*, No. 02 Civ. 7413, 2003 WL 40502, at *3 (S.D.N.Y. Jan. 2, 2003) ("Finally, Defino challenges the efficacy of the state court proceeding because the only remedy available is a "so called de novo hearing" before the Parole Board. Further, he argues that if the petitioner is denied parole again at that de novo hearing, 'the absurd procedural merry-go-round of sham hearings and meaningless state court review is given another 'spin.'") (quotation to record omitted) (cited in *Boddie*, 285 F.Supp.2d at 427). The district court in *Defino* characterized such an argument as "potentially powerful." *Defino*, 2003 WL 40502, at *3 (quoted in *Brown*, 2003 WL 941940, at *1). In *Boddie*, the district court held that this "thorny issue" did not need to be addressed because petitioner's substantive claims clearly were without merit, and it was more efficient to dispose of the petition in that way.

*Boddie*, 285 F. Supp.2d at 428 (citing *Brown*, 2003 WL 941940, at *1 ("[I]n habeas corpus cases, potentially complex and difficult issues about the various obstacles to reaching the merits should not be allowed to obscure the fact that the underlying claims are totally without merit.")). In all of these cases, the district court dismissed the due-process and equal-protection claims on substantive grounds and declined to rule on the procedural question of exhaustion. *Morel v. Thomas*, 2003 WL 21488017, at *2-3 ("[T]his Court declines to rule on Morel's exhaustion argument because the petition can be dismissed on the merits of both the due-process and equal-protection claims.") (citations omitted)).

As detailed throughout this opinion, it does not appear that any of the subsequent parole hearings cured the constitutional infirmities that Robles alleges occurred at the during the previous hearings. Given that I do not believe Robles' due process claim is clearly without merit, I am persuaded by Robles' argument concerning the futility of exhaustion under the circumstances present here. *Cf. Rosenkrantz v. Marshall*, 444 F. Supp.2d 1063, 1087 (C.D. Cal. 2006) (granting habeas relief and ordering that "[b]ecause petitioner's parole date has been twice determined under California law, and because both of those dates . . . have long since passed, respondent should be directed to release petitioner on parole within thirty (30) days of the date of entry of judgment[,]" rather than remanding for a new parole hearing) (citing *McQuillion v. Duncan*, 342 F.3d 1012, 1015-1016 (9th Cir. 2003) (affirming grant of relief on appeal after remand, and explaining that proper relief is immediate release rather than remand for further parole proceedings where no evidence in the record supported the [Board of Prison Terms]'s determination that the petitioner was not suitable for parole)).

## III.    General Legal Principles

### A. Standard of Review

" While one might second-guess the Parole Board's decision, and state court's approval of it," and I certainly do, in this case, I recognize that "it is not the role of the federal courts to do so." *Hunterson v. DiSabato*, 308 F.3d 236, 244 (3d Cir. 2002). On federal habeas, this Court's review "is quite distinct from that of the state appellate courts." *Id.* at 244-45. The Supreme Court has explained that because habeas review is collateral, and not supervisory, "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citation omitted) (quoted in *Hunterson*, 308 F.3d at 244). This Court's review is further curtailed by AEDPA, as Robles filed his petition after its enactment. AEDPA provides that "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

### B. Procedural Due Process in the Parole Context

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). The

Constitution itself may give rise to a liberty interest "by reason of guarantees implicit in the word 'liberty.'" *Id.* (citing *Vitek v. Jones*, 445 U.S. 480, 493-494 (1980) (finding that there is a liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution)). A liberty interest also "may arise from an expectation or interest created by state laws or policies." *Wilkinson*, 545 U.S. at 221 (citing *Wolff v. McDonnell*, 418 U.S. 539, 556-558 (1974) (finding that a state inmate possessed a liberty interest in avoiding withdrawal of state-created system of good-time credits).

In the parole context, the Supreme Court has held that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7 (1979). Although there is no constitutional right to parole, a state may create a liberty interest in parole by means of its statutes and regulations governing the parole decision-making process. *See id.* at 12; *accord Board of Pardons v. Allen*, 482 U.S. 369, 371 (1987) ("*Allen*") ("In *Greenholtz* the Court held that, despite the necessarily subjective and predictive nature of the parole-release decision, . . . , state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause."). The Supreme Court determined in *Greenholtz* that a state creates an expectation of release to parole supervision, rising to the level of a liberty interest within the meaning of the Due Process Clause, if its parole system mandates release whenever a parole board or similar authority determines that the necessary statutory prerequisites exist. *Board of Pardons v. Allen*, 482 U.S. at 376 (citing *Greenholtz*, 442 U.S. at 12).

In *Greenholtz,* the Supreme Court agreed with Nebraska inmates who argued that the

state's parole statute, which mandated parole if certain requirements were met, created a liberty interest in parole release. The petitioners relied upon the following section of the Nebraska statute to argue that the statutory language itself creates a an expectation of parole release:

> Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, *it shall order his release unless it is of the opinion that his release should be deferred because*:
> (a) There is a substantial risk that he will not conform to the conditions of parole
> (b) His release would depreciate the seriousness of his crime or promote disrespect for law;
> (c) His release would have a substantially adverse effect on institutional discipline; or
> (d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date.

*Greeholtz*, 442 U.S. at 7 (quoting NEB. REV. STAT. § 83-1,114(1) (1976) (emphasis supplied; quotation marks omitted).[5] The *Greenholtz* court "accept[ed] [the inmates'] view that the expectancy of release provided in this statute is entitled to some measure of constitutional protection." *Id.*

Later, in *Allen*, the Supreme Court affirmed the *Greenholtz* methodology of analyzing the statutory scheme to determine if it created a constitutionally protected liberty interest. Of significance was the "mandatory language–the use of the word 'shall'–and the presumption created–that parole release must be granted unless one of four designated justifications for deferral is found." *Allen*, 482 U.S. at 374 (citing *Greenholtz*, 442 U.S. at 11-12); s*ee also id.* at 374  n. 4 (citing *Hewitt v. Helms*, 459 U.S.  460, 471-72 (1983) (relying upon "the State's use of

---

[5]        The Nebraska parole statute also provided a list of 14 explicit factors and one catchall factor that the Parole Board was obligated to consider in reaching a decision. *Id.* n. 5 (citing NEB. REV. STAT. §§ 83-1,114(2)(a)-(n) (1976)).

'language of an unmistakably mandatory character' and its specification of 'substantive predicates' to confinement–'the need for control,' or 'the threat of a serious disturbance'"–to find that "Pennsylvania's administrative segregation statutes and regulations created a protected liberty interest in remaining in the general prison population")).

That the Nebraska statute, like most parole statutes, "vest[ed] very broad discretion in the Board," *Greenholtz*, 442 U.S. at 13, did not foreclose a finding of a due process right. The *Greenholtz* court explicitly rejected the parole board's argument "that a presumption [of release] would be created only if the statutory conditions for deferral were essentially factual, . . . rather than predictive." *Id.* at 12; *accord Allen*, 482 U.S. at 375. As explained by Justice Brennan, *Greenholtz* held that "the presence of general or broad release criteria–delegating significant discretion to the decisionmaker–did not deprive the prisoner of the liberty interest in parole release created by the Nebraska statute." *Allen*, 482 U.S. at 375. *Greenholtz* essentially "made a distinction between two entirely distinct uses of the term discretion." *Id.* As this Court believes that Justice Brennan's point is a critical one to bear in mind, it is repeated in full here:

> In one sense of the word, an official has discretion when he or she "is simply not bound by standards set by the authority in question." R. Dworkin, Taking Rights Seriously 32 (1977). In this sense, officials who have been told to parole whomever they wish have discretion. In *Greenholtz*, the Court determined that a scheme awarding officials this type of discretion does not create a liberty interest in parole release. But the term discretion may instead signify that "an official must use judgment in applying the standards set him [or her] by authority"; in other words, an official has discretion when the standards set by a statutory or regulatory scheme "cannot be applied mechanically." Dworkin, *supra*, at 31, 32; *see also id*., at 69 ("[W]e say that a man has discretion if his duty is defined by standards that reasonable [people] can interpret in different ways").

*Allen,* 482 U.S. at 375-76. *Greenholtz* thus held "that the presence of official discretion in this sense is not incompatible with the existence of a liberty interest in parole release when release is

required after the Board determines (in its broad discretion) that the necessary prerequisites exist." *Id.* at 376.

Following *Greenholtz*, the Supreme Court in *Allen* went on to determine that the Montana parole statute, like the Nebraska statute, created a liberty interest in parole release. Montana's law provided in pertinent part as follows:

> "Prisoners eligible for parole. (1) Subject to the following restrictions, the board *shall* release on parole . . . any person confined in the Montana state prison or the women's correction center . . . when in its opinion there is reasonable probability that the prisoner can be released without detriment to the prisoner or to the community[.]
>
> "(2) A parole shall be ordered only for the best interests of society and not as an award of clemency or a reduction of sentence or pardon. A prisoner shall be placed on parole only when the board believes that he is able and willing to fulfill the obligations of a law-abiding citizen."

*Allen*, 482 U.S. at 377 (quoting MONT. CODE ANN. § 46-23-201 (1985) (emphasis in original)). The Supreme Court explained that "[s]ignificantly, the Montana statute, like the Nebraska statute, uses mandatory language ("shall") to 'creat[e] a presumption that parole release will be granted' when the designated findings are made." 482 U.S. at 378 (quoting *Greenholtz*, 442 U.S. at 12). Thus, the Supreme Court found in the Montana statute, as in the Nebraska statute, a liberty interest protected by the Due Process Clause. *Id.* at 381.

In sum, *Greenholtz* and *Allen* stand for the proposition that

> while there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence, a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest.

*McQuillion v. Duncan*, 306 F.3d 895, 901 (9th Cir. 2002) (internal quotation marks and citations

omitted) (quoted in *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546, 555 (9th Cir. 2010). *See also Skowronek v. Brennan*, 896 F.2d 264, 268 n.7 (7th Cir. 1990) ("In general, parole statutes may create an expectation of parole. This expectation stems from mandatory language authorizing parole when certain findings regarding the inmate have been made."); *Huggins v. Isenbarger*, 798 F.2d 203, 205 (7th Cir.1986) (*per curiam*).

## IV. Analysis of Petitioner's Claims

### A. Denial of Procedural Due Process (Claim One of the Petition)

Robles argues that the version of New York's Parole Statute (former Correction Law § 213 ("Corr. Law § 213"), which was in effect at the time he was convicted and sentenced created a protected liberty interest in the same fashion as did the Nebraska and Montana statutes discussed in *Greenholtz* and *Allen*, respectively. Respondent argues that Corr. Law § 213 did not create such an interest warranting procedural due process protection.

### 1. Did New York's Parole statute in effect at the time petitioner was convicted, sentenced, and incarcerated (Former Correction Law § 213) create a protected liberty interest?

Parole in New York is, and always has been, "entirely a creature of statute." *Graziano v. Pataki*, No. 06-CV-0840, 2006 WL 2023082, at *4 (S.D.N.Y. July 17, 2006) (citing N.Y. EXEC. LAW § 259(1) ("There shall be in the executive department of state government a state division of parole. The chairman of the state board of parole shall be the chief executive officer of the division.")). Up until December 31, 1977, Corr. Law § 213 codified the standard to be used by the New York State Board of Parole in making decisions regarding a prisoner's release on parole. Corr. Law § 213 provided in relevant part as follows:

-30-

> Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties assigned in prison, but only if the board of parole is of the opinion that there is a reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law and that his release is not incompatible with the welfare of society. *If the board of parole shall so determine, such prisoner shall be allowed to go upon parole* outside of prison walls and inclosure upon such terms and conditions as the board shall prescribe, but to remain while thus on parole in the legal custody of the warden of the prison from which he is paroled, until the expiration of the maximum term specified in his sentence.

N.Y. CORR. LAW § 213 (McKinney 1968) (Repealed. L.1977, c. 904, § 2, eff. Jan. 1, 1978)

(quoted in Respondent's Memorandum of Law ("Resp't Mem.") at 17-18) (emphases supplied)

(Docket No. 20); *see also* Petitioner's Memorandum of Law ("Pet'r Mem").

There is no question that the wording of former N.Y. Corr. Law § 213–in particular the language that this Court has set out in italics–closely parallels the language in the Nebraska and Montana parole statutes, which were addressed in *Greenholtz* and *Allen*, respectively. *Compare* Former N.Y. CORR. LAW § 213 *with* NEB. REV. STAT. §§ 83-1, 114(1) (1976) (whenever a prisoner is considered for parole the Board "*shall* order his release unless it is of the opinion that his release should be deferred . . .") (emphasis added); MONT. CODE ANN. § 46-23-201 (1985) ("the board *shall* release on parole . . .") (emphasis added). Therefore, using the analytical method set forth in *Greenholtz*, this Court finds it clear that former N.Y. Corr. Law § 213 gave rise to a cognizable liberty interest in release on parole. *Compare with McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002) (finding that the following language of California Penal Code § 3041(b) "clearly parallel[ed]" the language in *Greenholtz* and *Allen* and therefore gave rise to a liberty interest: "'The panel or board *shall* set a release date unless it determines that the gravity of the current convicted offense or offenses . . . requires a more lengthy period of incarceration

for this individual, and that a parole date, therefore, cannot be fixed at this meeting.'") (quotation to California parole statute omitted). In other words, Corr. Law § 213 "use[d] mandatory language ("shall") to 'creat[e] a presumption that parole release will be granted' when the designated findings are made." *Greenholtz*, 442 U.S. at 7.

Respondent has not addressed the obvious similarities between former Corr. Law § 213 and the statutes in *Greenholtz* and *Allen*. Rather, respondent argues that this Court is bound by an "extensive body of state case law interpreting the scope of the interests that Correction Law § 213 and Executive Law § 259-i were intended to afford." Resp't Mem. at 20 (citing *Mahon v. Warden*, 1 Misc.2d 267 (N.Y. Sup. Ct. 1955), *aff'd* 2 A.D.2d 876 (App. Div. 1ˢᵗ Dept. 1956) (quoting *Cecere v. Jennings*, 250 N.Y. 329, 241 (N.Y. 1929)) and *Johnson v. Denna*, 40 Misc.2d 717, 718 (N.Y. Sup. Ct. 1963)). According to respondent, Corr. Law § 213 "never afforded prisoners a liberty interest." *Id.* First, in this Court's view, none of the cases cited by respondent either implicitly or explicitly held that Corr. Law § 213 did *not* afford inmates a liberty interest in parole. Furthermore, the Court declines to characterize three cases as an "extensive body of state case law." *Matter of Cummings v. Regan,* 76 Misc.2d 357, 350 N.Y.S.2d 842 (N.Y. Sup. Ct. 1973).

Most important, the Supreme Court has rejected the same argument urged by respondent here–namely, that a state's characterization of parole as a "privilege" precludes a prisoner from having a liberty interest in the possibility of parole under a particular statute. *See Allen*, 482 U.S. at 378. In *Allen*, after having found that the language of Montana's parole statute created a liberty interest, the Supreme Court addressed the parole board's argument that it was "bound by statements of the Montana Supreme Court that parole is a privilege, a matter of grace, not of

right." *Id.* The Supreme Court conceded that it was "true that a State has no duty to establish a parole system or to provide for parole for all categories of convicted persons, *see Greenholtz*, 442 U.S. at 7, and that a State may place conditions on parole release[.]" 482 U.S. at 378. However, it said, "only in this sense is parole a privilege, not a right." *Id.* at n.8. The Supreme Court found it significant that "[n]one of the Montana cases cited by the Board decide whether parole release is mandatory for an eligible inmate upon a finding that the statutory prerequisites have been met." *Id.* So too is the case with the decisions cited by respondent here. The Court believes that *Allen* allows for the co-existence of two propositions–that a prisoner in New York had a due process right in an expectancy of parole release once certain conditions were met under former New York Correction Law § 213, and that the discretion vested in the parole board to determine whether those conditions were met was nevertheless "very broad." *Greenholtz*, 442 U.S. at 13. Thus, the Court cannot agree that the statement in *People v. Cecere,* 250 N.Y. at 241, that "[p]arole is not a right, but a privilege" necessitates the result which respondent urges. Accordingly, I accept Robles's argument that under *Greenholtz* and *Allen*, former Correction Law § 213 should be interpreted to have provided for a liberty interest in parole release.

   **2.     What is the effect of the New York Legislature's repeal of Correction Law § 213 in 1977?**

   Contemporaneously with, and perhaps in response to, the Supreme Court's seminal decision in *Greenholtz v. Nebraska* in 1977, the New York State Legislature moved to repeal Corr. Law § 213. Its replacement is New York Executive Law ("Exec. Law") § 259-i which became effective January 1, 1978, and is still in effect. Resp't Mem. at 18 (citing 1977 N.Y. Laws, ch. 904).  Exec. Law § 259-i provides in relevant part as follows:

> Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society *and will not so deprecate the seriousness of his crime as to undermine respect for law.*

N.Y. Exec. L. § 259-i(2)(c)(A) (emphases supplied); *see also* N.Y. Comp. Code R. & Regs., tit. 9, § 8002.1.

In comparing the repealed section to the current statutory language, one sees that Exec. Law § 259-i and former Corr. Law § 213 are substantially the same, to the extent they (1) indicate that parole is not a "reward" and (2) employ a "reasonable probability" standard to the Parole Board's judgment. There are, however, two critical differences between the two. First, Corr. Law § 213's mandatory "shall . . . unless" language was stricken from Exec. Law § 259-i. That is, the new law deleted the following language, which was found in former Corr. Law § 213: If the Parole Board "*shall so determine* [that there is a "reasonable probability" the prisoner "will live and remain at liberty without violating the law and that his release is not incompatible with the welfare of society"], *such prisoner shall be allowed to go upon parole . . . .*" *Compare* former N.Y. Corr. Law § 213 *with* N.Y. Exec. Law § 259-i(2)(c)(A). The removal of this language is pertinent to the due process analysis, as discussed further below.

The second major difference is that the New York Legislature added a new retributive and deterrent factor to N.Y. Exec. Law § 259-i–the so-called "deprecation" requirement. *Cf. Shepard v. Taylor*, 556 F.2d 648, 653 (2d Cir. 1977) (describing as "factors of general deterrence and retribution" several criteria in 18 U.S.C. §§ 4206(1) & (2) governing release of adult federal prisoners on parole; these factors required determining that "that release would not deprecate the

seriousness of his offense or promote disrespect for the law" and "that release would not jeopardize the public welfare . . ."). Under Exec. Law § 259-i(2)(c)(A), the Parole Board now must find not only that there is a reasonable probability that the prisoner will be able to live at liberty without violating the law and that his release is not incompatible with the welfare of society, but also that releasing him on parole "will not so deprecate" the seriousness of his crime as to undermine respect for law." N.Y. EXEC. LAW § 259-i(2)(c)(A). In other words, the Parole Board is permitted to ask itself whether the inmate has been incarcerated for a long enough period of time to punish him and vindicate the victims. Thus, the Parole Board is now authorized to take a punitive or retributive factor into consideration, by asking whether the nature of the prisoner's crime *ever* makes release from incarceration to parole appropriate. While other factors that the Parole Board must consider are predictive, the "nature of the crime" is a static factor; it will never change. This factor entails an inquiry of a judicial nature and typically is performed by the sentencing court when it determines how long an inmate's sentence should be. *See Tarter v. State of New York*, 68 N.Y.2d 511, 517-18, 510 N.Y.S.2d 528, 503 N.E.2d 84 (N.Y. 1986) (noting that the functions of the Parole Board, in fitting the inmate's factual circumstances within the guidelines and using *discretion* to dispose of the matter, are classically judicial tasks). As a consequence of this "deprecation" amendment, the parole commissioners can deem certain crimes to be so brutal and heinous the nature of the crime can outweigh other factors and might never be overcome by genuine inmate rehabilitation efforts, thereby nullifying the possibility of parole.

      **3.**      **How did the enactment of Exec. Law § 259-i and repeal of Corr. Law § 213 affect the former liberty interest in parole?**

The Court next turns to the question of whether the liberty interest under former New York Correction Law § 213, a state-created due process right, survived repeal of the statute that created it. Robles argues that the "saving provision" contained in the law which repealed the Correction Law provisions applicable to parole "saves" the liberty interest created by former Correction Law § 213. The legislation enacting the new parole statute (L.1977, c. 904, §§ 4 to 17) provided in relevant part as follows: "§ 13. Existing rights and remedies preserved. No existing right or remedy of any character shall be lost, impaired or affected by reason of this act."

Several preliminary questions arise: The Court must ask whether a state legislature, after having created a statutory entitlement or liberty interest, may alter or terminate the entitlement by a later enactment. If not, there is no need to resort to interpretation of the "saving provision". On the other hand, if repeal of the old statute extinguished the liberty interest, then the Court must turn to an inquiry into the effect, if any, of the saving provision in § 13 of New York L. 1977, c. 904.

There does not appear to be any question that whatever liberty interest in parole existed under Corr. Law § 213 inhered in the statutory language–which was repealed by Exec. Law § 259-i. If a liberty interest resides in a statute's language, and the statute is effectively obliterated, then logically, it seems, so too does the liberty interest. The cases that the Court has found are to this effect. *See Toussaint v. McCarthy,* 801 F.2d 1080, 1093 (9th Cir. 1986); *Clark v. Brewer*, 776 F.2d 226, 228-30 (8th Cir.1985). In *Toussaint*, the petitioners sought to rely upon a previous holding of a district court that prisoners at state prison had a liberty interest in remaining in the general population of the correctional facility where they were housed. The Ninth Circuit refused to treat this favorable district court opinion as the law of the case on appeal from a subsequent

grant of injunctive relief where the two premises upon which the district court had relied in finding a liberty interest had been altered by intervening Supreme Court decisions and changes in state regulations. In particular, the statutory provision upon which the district court had relied had been repealed. The Ninth Circuit stated that the district court's holding based on the repealed section was entitled to no deference: "A state-created liberty interest exists only as long as the statute or regulation creating it remains effective. If the state repeals the statute or eliminates the regulation, the liberty interest ceases to exist." *Id.* (citing *Clark v. Brewer*, 776 F.2d at 232 ("We note simply that as the law now exists, the policies adopted by the Department of Corrections and the I.S.P. create a liberty interest in remaining in or returning to the general penitentiary population. However, contrary to the state's assertion, that decision does not permanently bind the state's discretion. Rather, the state is entirely free to modify or repeal the policies at issue in order to remove the substantive limitations on official discretion that now exist."); *see also Nolan v. Thompson*, No. 05-4237-CV-C-SOW, 2007 WL 148815, at *4 (W.D. Mo. Jan. 16, 2007).

In *Nolan*, the plaintiff brought a civil rights action under 42 U.S.C. § 1983. Nolan asserted, as Robles does here, that he had "a continued liberty interest in having his parole hearings conducted pursuant to the repealed state statute and regulations in effect at the time of his offenses. . . . ." 2007 WL 148815, at *4. The district court explained that the proposition urged by plaintiff was "not the law" since "[p]laintiff was not entitled to parole under the old law prior to the time it was amended[,]" and "[t]the legislature that creates a statutory entitlement (liberty interest) is not precluded from altering or terminating the entitlement by a later enactment." *Id.* (citing *Cavallaro v. Groose*, 908 S.W.2d 133, 134, 135-36 (Mo.1995); *Delay v.*

*Missouri Bd. of Probation and Parole*, 174 S.W.3d 662, 665 (Mo. App. W.D. 2005)). The

district court in *Nolan* held that

> the Missouri Legislature in 1982 was within its power to terminate the statutorily
> created parole entitlement that plaintiff now claims because plaintiff had no
> liberty interest at the time of the change. *Delay*, 174 S.W.3d at 665. A
> state-created entitlement does not create a substantive due process right that the
> state cannot rescind. *Cavallaro* [*v. Groose*], 908 S.W.2d [133,] 135-36 [(Mo.
> *banc* 1995)]. Thus, any expectation of liberty plaintiff had in the use of the old
> parole statute and regulations was extinguished by the enactment of new law.
> Plaintiff never acquired a liberty interest which was protected under the Due
> Process Clause of the Constitution. *Id.* Plaintiff is not entitled to a perpetual
> application of Missouri's old parole statute and regulations in all his subsequent
> parole hearings. *Id.* Based upon the undisputed material facts, plaintiff has no due
> process claim as a matter of law.

*Nolan v. Thompson*, 2007 WL 148815, at *4; *see also State v. Darden*, 12 S.W.3d 455, 459

(Tenn. 2000) ("While a statute may give rise to rights protected by article I, section 8 of the

Tennessee Constitution and the Due Process Clause of the Fourteenth Amendment to the United

States Constitution, the rights are not perpetual but exist only as long as the General Assembly

retains the language affording the right. . . . The General Assembly may enact statutes that afford

such rights, but the General Assembly is also free to amend these statutes, even where the

amendment eliminates the formerly protected interests.") (citing *Toussaint v. McCarthy*, 801

F.2d at 1092).

In both *Nolan* and *Cavallaro*, the prisoners were not asserting that they met the statutory

requisites for release *prior* to the new parole statutes being enacted but were nevertheless refused

parole. This is because at the time the new statutes were enacted, they had not yet served their

minimum periods of imprisonment so as to make them eligible for consideration for parole when

the prior statute was still in effect. Rather, the inmates in those cases were "assert[ing] a special

kind of liberty interest: the continuing right to parole hearings governed by the old statute in effect at the time of [their] crimes," *Cavallaro*, 908 S.W.2d at 135, which would effectively be "a *substantive* due process right that the state cannot rescind," *id.* (emphasis supplied). The *Cavallaro* court rejected this proposition, relying on the Supreme Court's consistent teachings that the substantive component of the Due Process Clause protects only "fundamental" rights, that is, those "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784 (1969); *accord Washington v. Glucksburg*. 521 U.S. 702, 721 (2005).

In *McKinney v. Pate,* 20 F.3d 1550 (11th Cir. 1994), also relied upon by the *Cavallaro* court, the Eleventh Circuit explicitly held that where the right exists only by state law, it is not protected by *substantive* due process and "may constitutionally be rescinded so long as the elements of *procedural* due process are observed" in the repeal process.  *McKinney,* 20 F.3d at 1556 (emphases added in *Cavallaro*). Accordingly, the court in *Cavallaro* found, "any continuing liberty interest in the use of the old parole statute was extinguished by enactment of the new law," *Cavallaro*, 908 S.W.2d at 135-36, because "'[t]he legislature that creates a statutory entitlement . . . is not precluded from altering or terminating the entitlement by a later enactment,'" *id.* (quoting *Packett v. Stenberg*, 969 F.2d 721, 726 (8th Cir.1992) ("While the legislative alteration or elimination of a previously conferred property interest may be a deprivation, the legislative process itself provides citizens with all the process they are due.")).

The weight of the relevant authority, e.g., *Nolan v. Thompson*, 2007 WL 148815, at *4,

considering claims virtually identical to those asserted by Robles here,[6] strongly supports the conclusion that as a general rule, when a legislature statutorily creates a liberty interest, there is no prohibition against it later altering or terminating the statutory entitlement. Further, these courts have found that an inmate is not entitled as a matter of due process to the perpetual application of the parole statute and regulations in effect at the time he committed his crimes. *See Delay*, *supra*; *Cavallaro*, *supra*.

Robles argues that despite the repeal of Corr. Law § 213, the saving provision in Section 13 of the enacting legislation for Exec. Law § 259-i preserves the liberty interest in parole release that he had under Corr. Law § 213. Robles correctly points out that the repealing act applicable in his case does have a saving clause, which provides that "[n]o existing right or remedy of any character shall be lost, impaired or affected by reason of this act."[7]

---

[6]     For example, the plaintiff in *Nolan*, an inmate in Missouri, asserted that he had a liberty interest under the old regulations and parole statute which were in effect at the time he committed his crimes. The Missouri parole statute was repealed by the Missouri Legislature in 1982, and a new parole statute was enacted. The 1981 Code of Regulations for parole was recodified in 1992. The 1981 (former) parole statute, which was in effect when plaintiff committed his crimes on November 27, 1981, provided a liberty interest in parole if the statutory conditions were satisfied, but the new section did not provide a liberty interest in parole. Pursuant to the regulations governing parole in 1981, plaintiff became eligible for parole and was given a hearing in September 2003, well after both the new statute and regulations had come into effect. Plaintiff contended that the former parole statute and corresponding regulations prevent the Missouri Board of Probation and Parole from continuing to consider the "seriousness, nature and circumstances" of his offense in determining whether to release him on parole. Plaintiff stated that under the old regulations, the deterrent and retributive portions of his sentence were fulfilled upon completion of 25 percent of the maximum sentence, and after such time, those factors could no longer be considered in denial of parole. It appeared that plaintiff was contending that rehabilitation was the only factor which can be considered, and that had not been the reason for the Board's denial of parole. Plaintiff Nolan argued that the defendants continued to deny him parole based upon the seriousness of his offenses, in violation of the old regulations and statute, and his due process rights.

[7]     Sections 93 and 94 of the General Construction Law provide:

§ 93. Effect of repealing statute upon existing rights.

The repeal of a statute or part thereof shall not affect or impair any act done, offense committed or right accruing, accrued or acquired, or liability, penalty, forfeiture or punishment incurred prior to the time such repeal takes effect, but the same may be enjoyed, asserted, enforced, prosecuted or

"[W]hen interpreting state statutes federal courts defer to state courts' interpretation of their own statutes." *United States v. Fernandez-Antonia*, 278 F.3d 150, 162 (2d Cir. 2002) (quoting *Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70, 76 (2000) (*per curiam*) ("As a general rule, this Court defers to a state court's interpretation of a state statute.") and citing *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 119 (2d Cir. 2001) (noting that it "must defer to the [state] [s]upreme [c]ourt on issues of state law")). Resolution of this issue is "guided not only by the language of the statute itself but also by New York courts' interpretation of the statute." *Fernandez-Antonia*, 278 F.3d at 162. Because the Court found no cases by New York State court interpreting this saving provision in particular, the Court proceeded by examining the available case law in New York considering saving clauses in general.

The New York Court of Appeals has stated that "[a] repealing statute which preserves rights contemplates definite and substantial ones which are, or are in the nature of, vested property rights and not merely inchoate personal privileges to which in a legal sense one has no indefeasible vested claim[.]" *Matter of Wentworth*, 230 N.Y. 176, 187, 129 N.E. 646, 649 (N.Y. 1920) (quoted in *Kelly v. State*, 57 A.D.2d 320, 323, 395 N.Y.S.2d 311, 314 (App. Div. 4th Dept. 1977)). Similarly, the catch-all saving clauses in the General Construction Law ("G.C.L.") have been said to refer to "vested rights or acts already taken or completed" (G.C.L. § 93), and

---

inflicted, as fully and to the same extent as if such repeal had not been effected.

§ 94. Effect of repealing statute upon pending actions and proceedings.

Unless otherwise specially provided by law, all actions and proceedings, civil or criminal, commenced under or by virtue of any provision of a statute so repealed, and pending immediately prior to the taking effect of such repeal, may be prosecuted and defended to final effect in the same manner as they might if such provisions were not so repealed.

"actions and proceedings involving substantive rights created by statutory law" (G.C.L. § 94). The resolution of this issue in other contexts has turned on whether the interest at issue "is a vested right preserved rather than an inchoate right divested by the statute's repeal," *People v. Mack*, 148 Misc.2d 306, 308, 560 N.Y.S.2d 607, 609 (N.Y. Crim. Ct. 1990). Thus, in Robles' case, the issue is whether his asserted liberty interest under form Correction Law § 213 can constitute a "vested right."

In the parole context, as discussed above in this Decision and Order, the Supreme Court has held that a prisoner is entitled to a due process protection for his liberty interest when such interest is created by a statutory authority. *E.g.*, *Allen*, 482 U.S. at 371 (citation omitted). "However, the scope of the liberty interest is confined to the inmate's *expectation* of the parole release." *People ex rel. Hunter v. Bara*, 144 Misc.2d 750, 752, 545 N.Y.S.2d 65, 66 (N.Y. Sup. Ct. 1989) (emphasis supplied) (citing *Allen*, 482 U.S. at 373; *Greenholtz*, 442 U.S. at 7)). The Supreme Court's teachings in *Greenholtz* and *Allen* lead this Court to conclude that any liberty interest a prisoner may have under a state's parole statute is not a vested right to immediate release, but merely the possibility of early release to parole. *Accord People v. Bara*, 144 Misc.2d at 752 (assuming a liberty interest in the prison regulations (N.Y. CORR. LAW § 805) regarding the certificate of earned eligibility which, when received, requires the grant of a hearing to permit an inmate to appear before the parole board, but rejecting habeas petitioner's contention that it was a "vested right") (citing *Allen*, 482 U.S. at 373; *Greenholtz*, 442 U.S. at 7).

Here, the mere possibility of early release for Robles did not "vest" during the time when former Corr. Law § 213 was still in effect. This is because Robles did not complete his minimum term of imprisonment, and thereby become eligible for a parole hearing, until 1984– seven years

after Corr. Law § 213 was repealed on August 11, 1977.[8] Robles never had a parole hearing under the old statute; Exec. Law § 259-i had been in effect for seven years by the time Robles first appeared before the Parole Board in 1984.

For the reasons stated above, I am compelled to conclude that the due process liberty interest created by former Corr. Law § 213 was not the type of "right or remedy" to which the savings provision was intended to apply. Therefore, any liberty interest Robles had under the old statute did not survive its repeal, and the provisions of the new parole statute, Exec. Law § 259-i, accordingly apply to his parole hearings.

**4.     Does New York's current parole statute, Executive Law § 259-i, give rise to a constitutionally protected liberty interest?**

**a.     Overview of New York's Current Parole Statute, Executive Law § 259-i**

Corr. Law § 213 was repealed in 1977, and was replaced by Exec. Law § 259-i which became effective January 1, 1978. Resp't Mem. at 18 (citing 1977 N.Y. Laws, ch. 904). As an initial matter, the Court notes that a comparison of the repealed section (former Corr. Law § 213) with the current statutory language ( Exec. Law § 259-i) reveals that they are the same to the extent they indicate that parole is not a "reward" and employ a "reasonable probability" standard to the board's judgment. However, a critical alteration in Exec. Law § 259-i is that Corr. Law § 213's mandatory "shall . . . unless" language, found to be integral to the Supreme Court's due process analysis in *Greenholtz* and *Allen*, was stricken from Exec. Law § 259-i, which provides

---

[8]          *Cf. Connecticut Board of Corrections v. Dumschat*, 618 F.2d 216, 220 (2d Cir.) ("To determine how many years an inmate must serve before his application [for clemency] is entitled to due process protection, it is necessary to determine at what point inmates are vested with a protected interest in the pardons process, i.e., when the probability that they will receive pardon and release becomes constitutionally significant."), *vacated and remanded on other grounds*, 442 U.S. 926 (1979).

in relevant part as follows:

> Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society *and will not so deprecate the seriousness of his crime as to undermine respect for law.*

N.Y. EXEC. LAW § 259-i(2)(c)(A) (emphases supplied). Exec. Law § 259-i(2)(c)(A) directs the Parole Division to consider certain specified factors, providing that "[i]n making the parole release decision, the guidelines . . . shall require that the following be considered: (i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interpersonal relationships with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the federal government against the inmate while in the custody of the department of correctional services and any recommendation regarding deportation made by the commissioner of the department of correctional services pursuant to section one hundred forty-seven of the correction law; and (v) any statement made to the board by the crime victim or the victim's representative, where the crime victim is deceased or is mentally or physically incapacitated." N.Y. EXEC. LAW § 259-i(2)(c)(A) ("Procedures for the conduct of the work of the state board of parole") (emphasis added); *see also* N.Y COMP. CODE R. & REG. Tit. 9, §§ 8001.3 ("[the Parole] Guidelines") (eff. March 23, 1978), 8002.3(b) ("Parole release decision") (eff. March 23, 1978).

Here, petitioner's institutional record, his release plans, and any statements made by the

crime victims' families are the pertinent considerations under Exec. Law § 259-i(2)(c)(A). *See* N.Y. Exec. Law § 259-i(2)(c)(A)(i), (iii), & (v). There is no deportation order in place, and Robles has not been eligible to participate in a temporary release program, so subsections (ii) and (iv) if Exec. Law § 259-i are not relevant.

Respondent notes that in addition, because this is a situation where the inmate's minimum sentence was imposed by a court, the Parole Division must also consider "(i) the seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court, the district attorney, the attorney for the inmate, the pre-sentence probation report as well as consideration of any mitigating and aggravating factors, and activities following arrest and prior to confinement; and (ii) prior criminal record, including the nature and pattern of offenses, adjustment to any previous probation or parole supervision and institutional confinement." N.Y. Exec. Law § 259-i(1)(a) (incorporated by reference into N.Y. Exec. Law § 259-i(2)(c)(A). *See Matter of King v. New York State Division of Parole*, 83 N.Y.2d 788, 790, 632 N.E.2d 1277 (N.Y. 1994) ("In addition, where, as here, the sentencing court, and not the Board of Parole, has set the minimum sentence of imprisonment, the Board must also consider the seriousness of the offense and the inmate's prior criminal record[.]") (citing N.Y. Exec. Law §§ 259-i(1)(a), (2)(c)).

> **b.     State and Federal cases interpreting Exec. Law § 259-i from a procedural due process standpoint**

Within a few months of the Supreme Court's decision in *Greenholtz* finding a liberty interest in Nebraska's parole statute, the Second Circuit determined that New York's then-new parole scheme (N.Y. Exec. Law § 259-i and N.Y. Comp. Code R. & Reg. tit. 9, § 8001.3) did

not create a due process liberty interest in parole. *See Boothe v. Hammock*, 605 F.2d 661, 664 (2d Cir. 1979); *accord Barna v. Travis*, 239 F.3d 169, 170 (2d Cir. 2001). Relying upon the methodology employed in *Greenholtz* and *Allen* of analyzing the language of the parole statute, the Second Circuit compared the Nebraska and Montana statutes to Exec. Law § 259-i and found New York's law to be legally distinguishable. In *Boothe*, for example, Second Circuit opined that it was " apparent that New York's parole provisions . . . do not establish a scheme whereby parole *shall* be ordered *unless* specified conditions are found to exist." *Boothe*, 605 F.2d at 664 (emphases added); *accord Barna*, 239 F.3d at 171. Therefore, the Second Circuit ruled, the New York parole scheme as currently formulated in Exec. Law § 259-i "is not one that creates in any prisoner a legitimate expectancy of release," meaning that New York prisoners "have no liberty interest in parole, and the protections of the Due Process Clause are inapplicable." *Barna*, 239 F.3d at 171; *see also id.* at 170 ("In order for a state prisoner to have an interest in parole that is protected by the Due Process Clause, he must have a legitimate expectancy of release that is grounded in the state's statutory scheme.") (citing, *inter alia*, *Greenholtz*, 442 U.S. at 11-13); *Carrion v. Smith*, No. 09-3717-pr (2d Cir. Feb. 8, 2010) (summary order) ("Although Petitioner is *eligible* for release, the decision to actually grant him parole remains within the discretion of the Parole Board. Inmates in New York have no liberty interest in parole because under New York law there is no entitlement to release.") (citing *Barna*, 239 F.3d at 171) (emphasis in original)). *Accord, e.g.*, *Green v. McCall*, 822 F.2d 284, 290 (2d Cir. 1987) (noting that *Boothe v. Hammock*, 605 F.2d 66, "involved (1) prisoners who had no release date set, (2) statutes that did not use the Nebraska 'shall . . . unless' structure found persuasive in *Greenholtz*, and (3) decisions that were wholly discretionary").

The New York Court of Appeals had not considered whether New York's parole system gave rise to a protected liberty interest, prior to the Second Circuit's decision in *Boothe v. Hammock* interpreting Exec. Law § 259-i. Shortly after *Boothe*, however, the New York Court of Appeals held,

> What the New York statute promises, simply put, is that guidelines shall be established and followed unless reasons are given for not following them. That guidelines are provided does not mean they cannot be deviated from or create an entitlement to release at any particular time; the system is thus discretionary and holds out no more than the possibility of parole. . . . [Exec. Law § 259-i] holds out no more than the possibility of parole and does not treat like situated persons differently. That being so, petitioner has demonstrated no protected liberty interest which would implicate the due process guarantee[.]

*Russo v. New York State Bd. of Parole*, 50 N.Y.2d 69, 76 (N.Y. 1980) (citing *Greenholtz*, 442 U.S. at 12; *Boothe*, 605 F.2d at 664; *Walker v. Oswald*, 449 F.2d 481, 485 (2d Cir. 1971)).

Notably, the "Legislative Findings and Purpose which accompany the adoption of Executive Law Article 12-B (L.1977 ch. 904, s 1, eff. Jan. 1, 1978) provides that 'the exercise of discretion, which is inherent in the parole system, must be structured and administered consistent with notions of due process. . . .'" *Rogers v. Hammock*, 100 Misc.2d 280, 283, 418 N.Y.S.2d 835, 837 (N.Y. Sup. Ct. 1979). That legislative finding is in tension with the courts' conclusions that Exec. Law § 259-i nevertheless does not create a liberty interest in parole warranting due process protection.

This Court is bound by the Second Circuit's case law holding that New York's current parole system, as embodied in Exec. Law § 259-i, does not give inmates a constitutionally protected liberty interest in parole release.

      **c.**      **If there were a cognizable liberty interest in parole release, to what kind of procedural due process would a New York**

**inmate be entitled?**

If there were a protected liberty interest embodied in Exec. Law § 259-i, the next

considerations would be (1) what process is due to the prisoner in protecting that interest, and (2)

whether the Parole Board's actions concerning the parole release decision accorded him such

process. *Greenholtz*, 442 U.S. at 16; *see also Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) ("A

liberty interest having been established [in avoiding "Supermax" confinement], we turn to the

question of what process is due an inmate whom Ohio seeks to place in [that type of

confinement].") (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (stating that the

requirements of due process are "flexible and cal[l] for such procedural protections as the

particular situation demands")).

In *Greenholtz*, the Nebraska statute at issue afforded a prisoner with a protected liberty

interest in the possibility of parole-release, the Supreme Court held that the statute provided

sufficient process to satisfy the prisoners' procedural due process rights:

> [W]e find nothing in the due process concepts as they have thus far evolved that
> requires the Parole Board to specify the particular "evidence" in the inmate's file
> or at his interview on which it rests the discretionary determination that an inmate
> is not ready for conditional release. The Board communicates the reason for its
> denial as a guide to the inmate for his future behavior. *See Franklin v. Shields*,
> 569 F.2d, at 800 (*en banc*). To require the parole authority to provide a summary
> of the evidence would tend to convert the process into an adversary proceeding
> and to equate the Board's parole-release determination with a guilt determination.
> The Nebraska statute contemplates, and experience has shown, that the
> parole-release decision is, as we noted earlier, essentially an experienced
> prediction based on a host of variables. *See Dawson*, The Decision to Grant or
> Deny Parole: A Study of Parole Criteria in Law and Practice, 1966 Wash. U. L. Q.
> 243, 299-300. . . . The Nebraska procedure affords an opportunity to be heard, and
> when parole is denied it informs the inmate in what respects he falls short of
> qualifying for parole; this affords the process that is due under these
> circumstances. The Constitution does not require more.

*Greenholtz*, 442 U.S. at 15-16; *accord Green v. McCall*, 822 F.2d at 291 ("The *Greenholtz* Court did not purport to establish what procedures might or might not be required for the protection of even the very limited liberty interest at stake in *Greenholtz* . . . ."). The Supreme Court specifically rejected the Nebraska inmates' argument that the Parole Board was required to "specify the particular 'evidence' in the inmate's file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release." *Greenholtz*, 442 U.S. at 15.

Under New York's current statute and regulations regarding parole determinations, an inmate is entitled to the following process: an interview conducted by a panel of at least two members of the Board of Parole, *see* N.Y. COMP. CODE R. & REGS., tit. 9, § 8002.2(a), (b); and, if parole is denied, a written statement provided "within two weeks of his interview, of the factors and reasons in detail for such denial" and which specifies "[a] date for reconsideration [of parole]" "within 24 months" of the previous hearing, *see* N.Y. EXEC. LAW § 259-i(2)(a); N.Y. COMP. CODE R. & REGS., tit. 9, § 8002.3(d). Robles does not contend that he was denied these procedural protections in regard to any of his parole determinations. As noted above, the Supreme Court has held that where a statute *does* confer a liberty interest in parole, due process is satisfied simply by an opportunity to be heard and a statement of the reasons for denial of parole. *See Greenholtz*, 442 U.S. at 16 (stating the due process does not require more than the procedures provided by the Nebraska parole statute, namely, "an opportunity to be heard," and when parole is denied, to be "inform[ed] . . . in what respect he falls short of qualifying for parole"). Robles similarly was afforded those procedural protections deemed to be adequate in *Greenholtz*: He had an opportunity to be heard and to present evidence at his interviews before

the Parole Board panels; the Parole Board has issued written, statements of denial, giving statutorily recognized reasons for its decision; notwithstanding that the decisions have more often than not been quite perfunctory and devoid of any truly individualized assessment of Robles as a parole candidate.

In addition, the Parole Board's determination was reviewed and affirmed by an administrative appeals board, and that determination was reviewed in an Article 78 proceeding in New York State Supreme Court. *Accord, e.g.*, *Tatta v. Miller*,No. 05-CV-1205 (FB)(MG), 2005 WL 2806236, *3 (E.D.N.Y. Oct. 27, 2005); *see also Schwartz v. Dennison*, 518 F. Supp.2d 560, 573 (S.D.N.Y. 2007) (in a proceeding pursuant to 42 U.S.C. § 1983, district court rejected procedural due process claims by inmate denied parole under Correction Law § 805, "confirm[ing] what was stated in *Greenholtz*: an opportunity to be heard and a statement of the reasons for denial of parole 'affords [all] the process that is due' where a parole statute creates a protected liberty interest"); *Blackett v. Thomas*, No. 02 Civ.9258 RMB FM, 2003 WL 21744080, at *3 (S.D.N.Y. July 14, 2003) ("The New York parole system meets these minimal [due process] requirements [as stated in *Greenholtz*]."). It bears noting again that in cases where courts have found a protected liberty interest in parole, such as *Greenholtz*, all that the Constitution required was certain procedures–not a particular outcome as a result of the process. *Accord, e.g.*, *Tatta v. Miller*, 2005 WL 2806236, at *3 (E.D.N.Y. Oct. 27, 2005) ("Moreover, regardless of whether New York's parole scheme gives rise to a legitimate expectation of release, the denial of Tatta's application for parole comported with procedural due process, which, in this context, requires only that the inmate be given an opportunity to be heard and informed of the reasons for the denial of parole. *See Greenholtz*, 442 U.S. at 16. Tatta received both a hearing

and the reasons for the denial of parole.") (internal parenthetical omitted); *Morel v. Thomas*, No. 02 CV 9622(HB), 2003 WL 21488017, at *4 (S.D.N.Y. June 26, 2003) ("However, even if Morel is correct that the New York parole scheme, like the Nebraska statute, creates a liberty interest, he overlooks the fact that New York's scheme contains procedures similar to Nebraska's to minimize the risk of erroneous decisions, which the Court found met due process requirements.") (citing *Greenholtz*, 442 U.S. at 16) (parenthetical omitted)).

> **d.      Is there the possibility of a limited liberty interest in parole based upon** *Rodriguez v. Greenfield*, 7 Fed. Appx 42 (2d Cir. 2001)?

Notwithstanding its decision in *Barna v. Travis*, the Second Circuit has held that an inmate denied parole, who alleged that the Parole Board improperly failed to consider sixteen years of missing prison records and a presentence investigations report, in contravention of N.Y. Exec. Law § 259-i and 9 N.Y. Comp. Reg. & R., tit. 9, § 8001.3(a), might be able to state a due process claim for purposes of maintaining a civil rights suit under 42 U.S.C. § 1983. *Rodriguez v. Greenfield*, No. 99-0058, 7 Fed. Appx 42, *45, 2001 WL 290503, at **3 (2d Cir. Mar. 23, 2001). The Second Circuit in *Rodriguez* cited favorably to *Monroe v. Thigpen*, 932 F.2d 1437 (11th Cir. 1991),[9] in which an Alabama inmate alleged that parole board improperly relied upon materially

---

[9]        In *Monroe*, the issue was that the Alabama state parole board knowingly relied upon materially false information in the prisoner's file in making its parole decision. 932 F.2d at 1442. The Eleventh Circuit, which had previously disclaimed a due process liberty interest in parole under Alabama law because the relevant Alabama parole statute was framed in discretionary terms, nevertheless found that the parole board's discretion was not unlimited. In particular, the Eleventh Circuit stated, the parole board was not allowed to engage in "flagrant or unauthorized action" or administer the parole system "maliciously or in bad faith," thereby causing the parole system to "become[ ] constitutionally offensive . . . ." *Monroe*, 932 F.2d at 1441-42. It bears noting that the Eleventh Circuit, before it examined the substance of the parole board's decision in *Monroe v. Thigpen*, first found that the prisoner had at least a *limited* liberty interest. In other words, although it found that the Alabama parole statute did not create a general liberty interest in the possibility of release to parole, it did "create[ ] an expectancy of a parole determination without reliance on false information." *Gordon*, 592 F. Supp.2d at 653 n.56 (citing *Monroe*, 932 F.2d at 1442 (citing *Thomas v. Sellers*, 691 F.2d 487, 489 (11th Cir. 1982)). In light of this limited interest, the Eleventh Circuit held that the parole board had acted "arbitrarily and capriciously in violation of due process" by relying upon

false information in his file. The Second Circuit found it significant that a New York State Supreme Court had invalidated one of Rodriguez's parole denials after finding that the Parole Board had engaged in "unauthorized activities by making parole determinations absent a complete record[.]" *Rodriguez*, 7 Fed.Appx. at *45, 2001 WL 290503, at **2.

The *Rodriguez* panel acknowledged the Circuit's earlier holding in *Barna v. Travis*, that no liberty interest exists in New York State's parole scheme because the statute is purely discretionary and does not create a legitimate expectancy of release. 7 Fed.Appx. at *44, 2001 WL 290503, at **2. The Second Circuit distinguished *Barna* and found that it did not answer the question before it in *Rodriguez*, namely, whether a New York state prisoner has a liberty or property interest in having the Parole Board comply with its own statutory and regulatory guidelines in determining whether to grant or deny parole. In Rodriguez's particular case, the issue was whether Rodriguez had a due process right to have the Parole Board make its parole decisions after reviewing the missing prison records and presentence investigation report in conformance with the procedures explicitly dictated by state statute in N.Y. EXEC. LAW § 259-i and N.Y. COMP. REG. & R., tit. 9, § 8001.3(a). The discretionary nature of New York's parole statute did not foreclose Rodriguez from stating a cause of action because, the Second Circuit reasoned, the Parole Board could not possibly have exercised its discretion to consider the relevant parole-suitability factors in Exec. Law § 259-i where it did not have information concerning those factors for at least sixteen of the thirty years in which plaintiff had been incarcerated. *Rodriguez*, 7 Fed.Appx. 42, at *44-45, 2001 WL 290503, at **2. Noting that the particular due process issue raised by Rodriguez with respect to parole decisions based upon

demonstrably false information in prisoner Monroe's file in making its determination to deny parole. *Id.* at 1442.

missing records was an unsettled question, the Second Circuit therefore vacated the dismissal of plaintiff's § 1983 claim concerning the parole denial and remanded it to the district court for further briefing. *Id.* There are no further reported or unreported decisions in this matter–either by the district court or the Second Circuit.

The Court reads *Rodriguez* as providing support for the proposition that even in the absence of a general liberty interest in parole-release, "flagrant or unauthorized action," *Monroe*, 932 F.2d at 1441 (quotation omitted), by a Parole Board "becomes constitutionally offensive[,]" *id.* (cited with approval in *Rodriguez*, 7 Fed.Appx. at *45, 2001 WL 290503, at **2). However, this Court, which must evaluate Robles' habeas petition through the deferential lens of AEDPA, may only grant relief if the state court unreasonably applies, or issues a decision contrary to, clearly established *Supreme Court* precedent. *See Kruelski v. Connecticut Superior Court For Judicial Dist. of Danbury*, 316 F.3d 103, 105 (2d Cir. 2003) ("Among the AEDPA's new conditions is the requirement that an application for a writ of habeas corpus may be granted only if (1) the state decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*[.]'") (emphasis supplied). The Court cannot grant relief based upon a state court ruling which amounts to an incorrect application of Circuit precedent alone. *See Renico v. Lett*, 130 S.Ct. 1855, 1865-66 (2010) ("The Sixth Circuit also erred in relying on its own *Fulton v. Moore* decision for the proposition that Arizona v. Washington sets forth three specific factors that determine whether a judge has exercised sound discretion. Because *Fulton*[, a circuit court decision] does not constitute "clearly established Federal law, as determined by the Supreme Court," § 2254(d)(1), failure to apply it does not independently authorize habeas relief under AEDPA.").

Here, the decision in *Rodriguez v. Greenfield* was not published, and, under the Circuit's rules, it may not be considered precedential or binding authority. It is troublesome to this Court, however, that Robles' claim that the Parole Board acted outside of its authority is not entirely unfounded. Ultimately, however, as discussed in the following paragraphs, I could not grant habeas relief upon it, even if I could consider *Rodriguez.*

Robles asserts that the Parole Board has acted in contravention of Exec. Law § 259-i by considering an "impermissible" factor to deny him parole–namely, public pressure on the Parole Board to keep him forever incarcerated. The records submitted by Robles include a letter from Ed Koch, written during his tenure as the mayor of New York City, in which Koch urges the Parole Board to deny Robles parole based upon the heinousness of his crimes. Robles also points to an article from the New York Times in which the reporter discusses the campaign by one victim's cousin, Michael Wylie, to see that Robles never gets released on parole.

The parole statute specifically does permit the Parole Board to consider statements by the crime victim, or, as in this case, the decedent's relatives. Thus, any statements from Mr. Wylie on behalf of his deceased cousin may be considered by the Parole Board. However, as Robles points out, nowhere in the parole statute and regulations does it say that general public opinion is a factor that may or should be considered by the Parole Board. Thus, if the Parole Board is taking into account the opinion of former Mayor Koch, as expressed in his letter, in this Court's opinion it is doing so illegally. The Court notes that the Parole Board has never specifically discussed the Koch letter or the Wylie statements in either the parole hearings or the parole decisions. The Parole Board has discussed the notoriety of the case at Robles' parole hearings in n1986, 1990, 1992, and 1996, as respondent concedes. *See* Pet'r Exs. C, H, I & J (copies of the transcripts

from the 1986, 1990, 1992, and 1996 parole hearings); Resp't Mem. at 26-27.

Respondent argues that petitioner's claims with respect to those earlier parole proceedings are unexhausted, *see* 28 U.S.C. § 2254(b)(1), and also time-barred under the one-year statute of limitations set forth by AEDPA, specifically, 28 U.S.C. § 2244(d)(1)(A). Resp't Mem. at 26. As noted above, the Court finds Robles' argument concerning the futility of exhaustion to be persuasive. Nevertheless, the Court is constrained to agree with respondent that the claims pertaining to the 1986, 1990, 1992, and 1996 parole proceedings are untimely.

Respondent argues that in any event, the claims are not substantiated when the transcripts and the decisions from 1986, 1990, 1992, and 1996 are viewed in their entirety. Resp't Mem. at 26-27. First, during the 1986 parole interview, the Parole Board did refer to the publicity surrounding Robles' case. One commissioner remarked, "The offense we are talking about was one that had some publicity attached to it in August of 1963." Ex. F at 2-3 (quoted in Resp't Mem. at 26). However, as respondent points out, the complete transcript of the proceeding shows that the Parole Board devoted nearly all of the interview to a discussion of Robles' criminal history; the facts and circumstances surrounding the two murders and Robles' motives in committing them; Robles' activities and behavioral record at the prison; his relationships with other inmates; and his plans in the event he were released from prison. Ex. F at 2-10 (quoted in Resp't Mem. at 26). The Parole Board did not refer to the publicity of the case in its decision denying parole. *See* Ex. G.

At the 1990 hearing, the Parole Board asked Robles, "How about the notoriety?" Pet'r Ex. H. Robles responded that he was contemplating a name change and was concerned about being able to find work. Taking the question in context, it appears that the Parole Board

was inquiring into Robles' ability to handle the likely pressures and problems he would face upon release. I agree with respondent that the question did not indicate that the Parole Board believed that the notoriety, in and of itself, was a reason to deny parole. *See* Resp't Mem. at 27. In addition, this topic was not mentioned in the decision denying parole.

During the 1996 interview, the Parole Board commented to Robles, "We know that your case is a notorious case in the sense of press coverage for a number of reasons, some of which have nothing to do with you." Ex. T. As one commissioner noted, the case had generated a great deal of publicity due to the identity of the victims and the coercive police tactics used in connection with the arrest of the first individual tried and convicted for the crimes, a man who had falsely confessed and whose conviction was later overturned. However, the commissioner then stated, "[T]hose issues are not relevant to our decision today." Ex. T at 11-12.

With regard to the 1992 interview, respondent concedes that the transcript "suggests that the publicity surrounding the case may have figured into the Panel's decision to deny petitioner parole." Resp't Mem. at 27. During that interview, one parole commissioner remarked,"Well, you're aware of all the publicity, I'm sure. It's a tough case for us. It's a long time ago. It's a serious offense." Pet'r Ex. I. Respondent correctly points out that the Parole Board also questioned petitioner at length about (1) how and where he would live after his release from prison; (2) his motive in committing the murders; (3) the facts relating to the crimes; and (4) his age at the time of the murders. In addition, the Parole Board did not refer to concerns about negative publicity in its decision denying parole.

After reading the transcript from the 1992 hearing, the Court believes that Robles' argument is well-founded; this Parole Board considered the notoriety of Robles case, apparently

in connection with the negative publicity that the Board feared would redound to it in the event Robles was released. The only outside opinions that the Parole Board is statutorily authorized to consider are those of the victims, or their representatives if the victims are deceased; the parole statute specifically mentions these "victim impact" statements as a factor that may be considered. However, the statute does not authorize the Parole Board to take into account the opinion of the general public about a particular inmate's release or, for that matter, the release of violent felons as a group, when it is conducting the required *individualized* assessment of an inmate's suitability for parole.

Respondent points out that courts in this Circuit, including courts from this District, have held that the Parole Board's decision to "get tough" on violent offenders because of public and political pressure is "entirely permissible, as it closely relates to the statutory factor of whether 'release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law.'" Resp't Mem. at 27-28 (quoting *Morel v. Thomas*, No. 02 CV 9622 (HB), 2003 U.S. Dist. LEXIS 10935, at *19-20 (S.D.N.Y. June 26, 2003) (quoting Executive Law § 259-i(2)(c)(A)); *accord Harris v. Travis*, No. 04-CV-911A(F), 2007 U.S. Dist. LEXIS 33457, at *11 (W.D.N.Y. May 7, 2007) ("Additionally, a parole board's denial of parole resulting from political pressure to 'get tough on violent felony offenders,' is based on a permissible consideration and does not violate a prisoner's federal equal protection rights, absent any claim that the denial was based on race, religion, or intent to punish or inhibit the exercise of constitutional rights, or malicious or bad faith intent to injure a person.") (quoting *Seltzer,* 2003 WL 21744084, *4  and citing  *Blackett v. Thomas*, 293 F. Supp.2d 317, 320 (S.D.N.Y.2003) (holding denial of parole does not violate equal protection rights, even if parole denial was the

result of "political pressure" on the part of the state governor, who had allegedly conducted an "overt and covert campaign to eliminate parole for all so-called 'violent felony offenders'")), adopted by 2007 U.S. Dist. LEXIS 39143 (W.D.N.Y. May 30, 2007); *Salahuddin v. Unger*, No. 04 CV 2180 (JG), 2005 U.S. Dist. LEXIS 18865, *22-23 (E.D.N.Y. Sept. 2, 2005). *Seltzer v. Thomas*, No. 03 Civ.00931 LTS FM, 2003 WL 21744084, *4 (S.D.N.Y. July 29, 2003) ("Seltzer claims that his parole denial was the result of "political pressure" on the part of Governor Pataki, who has conducted an "overt and covert campaign to eliminate parole for all so-called 'violent felony offenders." 'Assuming that this is true, it does not constitute an impermissible ground for the denial of parole. Indeed, as Judge Baer has observed, "the motive and animus that [Seltzer] contends is impermissible– namely the Board's decision to get tough on violent offenders because of public and political pressure–in fact seems entirely permissible, as it closely relates to the statutory factor of whether 'release is not incompatible with the welfare of society and will not so deprecate the seriousness of the offense as to undermine respect for law."') (quoting *Morel v. Thomas*, 2003 WL 21488017, at *5).

The Court has reviewed the foregoing cases cited by respondent. Although instructive, the Court does not believe the quoted sections are directly apposite since the quotations relied upon by respondent occurred in the district courts' discussions of the inmates' equal protection claims, not due process claims. The Court has carefully reviewed Exec. Law § 259-i, and does not read it as indicating, either implicitly or explicitly, that public opinion or notoriety of the crime are factors to be considered by the Parole Board. In any event, the Court does not have occasion here to resolve this particular issue of whether public opinion and the fear of negative publicity improperly factored into the Parole Board's decision-making process. This is because, as noted

above, Robles' constitutional claims regarding the 1986, 1990, and 1992 parole denials are untimely in the context of his 2005 habeas petition.

With regard to the 2002 parole denial (the one, timely claim as to which respondent concedes exhaustion), respondent argues that the record refutes petitioner's claim that political pressure and public opinion tainted the Board's decision. Resp't Mem. at 25. The Court has reviewed the 2002 transcript and respondent is correct that the 2002 Parole Board made no mention of the publicity surrounding the case in either its interview questions to petitioner or its decision denying him parole. *Id.* (citing Resp't Exs. CC & DD).

Robles has alleged that political pressure and public opinion tainted the 2002 parole proceeding. The Court agrees with Robles that these factors are not among those which the Parole Board is statutorily authorized to consider. Even assuming that such a limited liberty interest exists, the Court cannot grant habeas relief here. As respondent argues, this contention is not supported by the record; the 2002 Parole Board did not mention the publicity surrounding Robles' case in either its interview questions to petitioner or its decision denying him parole. *See* Resp't Exs. CC & DD; Resp't Mem. at 26. Thus, in order to find that the 2002 hearing was tainted by the Parole Board's improper consideration of public opinion and notoriety would require the Court engage in speculation. To the extent that Robles argues that the records of the 1986, 1990, 1992, and 1996 parole proceedings show that the Board improper was swayed by political pressure and public opinion, any claims regarding those parole denials are time-barred by the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1)(A), as respondent argues. *See* Resp't Ex. at 26-28.

        **e.**        **Has Robles demonstrated a violation of New York's**

**standard, that is, has the Parole Board acted arbitrarily and capriciously with an irrationality bordering in impropriety?**

On the basis that parole release is a discretionary function of the Parole Board, courts in New York sitting in appellate review generally have declined to disturb a determination regarding parole release absent a showing that the Board's decision was "irrational 'bordering on impropriety' and that the determination was, thus, arbitrary and capricious[.]" *Rios v. New York State Division of Parole*, No. 31731/06, 15 Misc.3d 1107, 836 N.Y.S.2d 503, 2007 N.Y. Slip Op. 50529 2007 WL 846561, at * (N.Y. Sup. Ct. Mar. 12, 2007) (unreported opn.) (citing *Matter of Silmon v. Travis*, 95 N.Y.2d at 476. The New York Court of Appeals has explained,

> Our jurisprudence also is well settled as to the authority of the Parole Board. Judicial intervention is warranted only when there is a "showing of irrationality bordering on impropriety " (*see*, *Matter of Russo*, *supra*, 50 N.Y.2d at 77 (1990); *Matter of Briguglio v. New York State Bd. of Parole*, 24 N.Y.2d 21, 29 (1969)). Thus, we review whether the Board's decision to deny parole was arbitrary or capricious.

*Matter of Silmon v. Travis*, 95 N.Y.2d 470, 476 (N.Y. 2000); *accord Matter of King v. New York State Div. of Parole*, 190 A.D.2d 423 (N.Y. App. Div. 1st Dept. 1993), *aff'd*, 83 N.Y.2d 788, 610 N.Y.S.2d 954, 632 N.E.2d 1277 (N.Y. 1994); *Matter of Weinstein v. Dennison*, 7 Misc.3d 1009 (N.Y. Sup. Ct. 2005); *Matter of Coaxum v. New York State Div. of Parole*, 14 Misc.3d 661, 667-72, 827 N.Y.S.2d 489, 493-98, 2006 N.Y. Slip Op. 26493 (N.Y. Sup. Ct. 2006)).

Although the Parole Board must consider all of the relevant statutory factors, the statute, *see* N.Y. Exec. Law § 259-i, does not specify the weight to be attached to each factor. *Mitchell v. Conway*, No. 04 CV 1088, 2006 WL 508086, at *4 (E.D.N.Y. Mar. 1, 2006) (observing that N.Y. EXEC. LAW § 259-i(2)(c)(A) simply enumerates the factors the Parole Board must consider).

New York state courts have "it is well settled that the weight to be accorded to each of the factors lies solely within the discretion of the Parole Board[.]" *Garcia v. New York State Board of Parole*, 239 A.D.2d 235, 239 (App. Div. 1st Dept. 1997) (citing, *inter alia*, *Klein v. New York State Division of Parole*, 202 A.D.2d 319, 320, 609 N.Y.S.2d 208 (App. Div. 1st Dept. 1994) (citing *Matter of Russo v. New York State Board of Parole*, 50 N.Y.2d at 77).

" While a Parole Board need not expressly discuss each of these guidelines in its determination, it must provide the inmate with a proper hearing in which only the relevant guidelines are considered." *Matter of King v. New York State Div. of Parole*, 83 N.Y.2d 788, 791, 610 N.Y.S.2d 954, 632 N.E.2d 1277 (N.Y. 1994) (internal citations omitted). The New York Court of Appeals has stated that the Parole Board must provide an inmate with a *proper* hearing in which *only* the relevant guidelines are considered. *Id.* And, although it need not discuss every statutory factor set forth in Executive Law § 259-i, the Parole Board must consider these factors "as to every person who comes before it." *Rios v. New York State Div. of Parole*, No. 31731/06, 2007 WL 846561, at *4 (N.Y. Sup. Ct. Mar. 12, 2007) (citation and internal quotation marks omitted).

Although "the ultimate decision to parole a prisoner is discretionary[,]" *Silmon v. Travis*, 95 N.Y.2d at 476-77, "consideration of these guidelines [as set forth in Exec. Law § 259-i(2)(c)(A)] is mandatory, *id.*[10] Importantly, the Parole Board's "discretion is not unfettered" and

---

[10]     Reading the applicable statutory provisions (N.Y. EXEC. LAW §§ 259-i(2)(c)(A), 259-i(1)(a)) in tandem, the Parole Board was required to consider  determining Robles' suitability for parole:
- (1) Whether there is a reasonable probability that Robles will live and remain at liberty without violating the law;
- (2) Whether his release is compatible with the welfare of society;
- (3) Whether his release to parole will not so deprecate the seriousness of his crime as to undermine respect for law;
- Robles' institutional record including (5) program goals and accomplishments, (6) academic achievements, (7) vocational education, training or work assignments, and (8)

"[t]he main limitation is that the Board cannot base its determination solely on the serious nature of the crime." *People v. Almonor*, 16 Misc.2d 1126, 847 N.Y.S.2d 900, 2007 WL 2379719, at ***4, N.Y. Slip. Op. 51588(U) (N.Y. Sup. Ct. Apr. 21, 2007) (unpublished opn.) (citing (citing *Guzman v. Dennison*, 32 AD3d 798, 821 N.Y.S.2d 208 (N.Y. App. Div. 1st Dept. 2006) (affirming County Court's decision denying parole, where additional factors, besides the circumstances of the crime, were set forth as basis for denial); *Rios v. New York State Div. of Parole*, Index No. 31731/06 (Sup.Ct. Kings County March 12, 2007), 2007 WL 846561, at *4) (citation and internal quotation marks omitted); *Prout v. Dennison*, 26 A.D.3d 540, 541, 809 N.Y.S.2d 261, 262 (3d Dept.2006) (finding that Board of Parole failed to comply with its duty to consider statutory factors in evaluating application for discretionary release on parole, where Board stated that "discretionary release is contrary to the best interest of the community" and "is not appropriate, as this depraved indifference to life is not consistent with community standards and interests, and release would not serve society," but the Board's decision lacked any analysis of statutory and regulatory criteria of § 259-i, and implied that prisoner had burden to demonstrate that his release would somehow enhance society).

---

participation in therapy and (9) interpersonal relationships with staff and inmates;
- Robles' release plans including the (10) community resources, (11) employment, (12) education and training, and (13) support services available to him;
- (14) Any statement made to the Parole Board by the victims' representatives, since the crime victims here are deceased;
- The (15) seriousness of Roble's conviction offense, giving consideration to (16) the type of sentence; (18) the length of sentence; and (19) recommendations of the sentencing court, the district attorney, defense counsel; (20) the pre-sentence probation report; (21) any mitigating and (22) aggravating factors; and his activities (23) following arrest and (24) prior to confinement; and
- (25) Robles' prior criminal record, including the nature and pattern of his earlier offenses, and (26) his adjustment to any previous probation, parole supervision, and institutional confinement.

*See* N.Y. Exec. Law §§ 259-i(2)(c)(A), 259-i(1)(a); *see also Silmon v. Travis*, 95 N.Y.2d 470, 476-77, 718 N.Y.S.2d 704, 708 (N.Y. 2000).

Thus, "while the courts [in New York] remain reluctant to second guess the decisions of the Board," *Matter of King v. New York State Div. of Parole*, 190 A.D.2d 423, 431 (N.Y. App. Div. 1st Dept. 1993), *aff'd*, 83 N.Y.2d 788, 610 N.Y.S.2d 954, 632 N.E.2d 1277 (N.Y. 1994), they have stated that "it is unquestionably the duty of the Board to give fair consideration to each of the applicable statutory factors as to every person who comes before it, and where the record convincingly demonstrates that the board did in fact fail to consider the proper standards, the courts must intervene[,]" *id.*, 190 A.d.2d at 431 (citing *People ex rel. Herbert v. New York State Bd. of Parole*, 97 A.D.2d 128, 133, 468 N.Y.S.2d 881 (N.Y. App. Div. 1st Dept. 1983); *King v. New York State Div. of Parole*, 190 A.D.2d 423, 431, 598 N.Y.S.2d 245, 250 (1993).

The New York Court of Appeals "allows the denial of parole based solely on the severity of the offense so long as there is *'a showing of some aggravating circumstances beyond the inherent seriousness of the crime itself.'"* *Anthony v. New York State Div. of Parole*, No. 06 Civ. 180, 2006 WL 3859215, at *10 (S.D.N.Y. Jan. 4, 2006) (quoting *King v. N.Y. State Div. of Parole*, 190 A.D.2d 423, 598 N.Y.S.2d 245, 251 (App. Div. 1st Dept. 1993), *aff'd*, 83 N.Y.2d 788, 610 N.Y.S.2d 954, 632 N.E.2d 1277 (N.Y. 1994) (emphasis supplied). As discussed in the following paragraphs, there is *no* such "additional aggravating factor" in Robles' case. To find otherwise on this record would be a completely unreasonable determination of the facts in light of the evidence presented. Thus, as explained more fully below, Robles has satisfied the New York state standard for demonstrating that state judicial intervention is warranted in his case.

Petitioner's case tells a story of evolving penealogical philosophy, flawed procedures, and nervous parole officials. Petitioner's timing could not have been worse. Imprisoned in 1964, Petitioner began his 46 year period of incarceration at the beginning of a change in penal

philosophy.  One commentator has observed that "[b]eginning in the 1960s and culminating in the 1970s, influential judges and scholars urged the abandonment of rehabilitation as a goal of punishment*."* Michael Vitiello, *Reconsidering Rehabilitation*, 65 TUL. L. REV. 1011, 1012 (1991) (footnotes omitted).  In the space of slightly under two-decades time, the "rehabilitative ideal", which had been described less than twenty years ago as "the predominant justification of punishment" experienced a wholesale rejection by almost all players in the criminal justice system.  *Id.* (citations omitted) (noting that critics "focused on both the philosophical and the factual failures of rehabilitation," challenged the underlying medical model (i.e., criminals were sick and in need of treatment); criticized the practices engendered by the "rehabilitative" model, such as indeterminate sentencing that allowed incarceration as long as necessary to "cure" the offender; and urged repeal of parole because it led to uncertainty about an actual release date and to unfairness since parole decisions were not based on meaningful guidelines).   By the mid-1980s, as one commentator observed, a major criminal law treatise had sounded the death knell of the "rehabilitative model," noting: "[R]etribution . . . 'is suddenly being seen by thinkers of all political persuasions as perhaps the strongest ground . . . upon which to base a system of punishment.'" *Id.* at n.7 (citing WAYNE R. LAFAVE & AUSTIN W. SCOTT, CRIMINAL LAW, 26 (2d ed. 1986) (quoting Martin R. Gardner, *The Renaissance of Retribution—An Examination of Doing Justice*, 1976 WIS. L. REV. 781, 784 (1976)).  As circumstances would have it, Robles became eligible for parole on the cusp of this period of evolving thought.

Ironically, although this shift away from rehabilitation led to a considerable abandonment of indeterminate sentencing as a rehabilitative model in many states as to many crimes in favor of a retributive model, petitioner's crimes and his sentence for those crimes was indeterminate.  At

the same time, under the rehabilitation model, the guiding philosophy of parole and its principal

tool was rehabilitation, as was probation for non-prison offenses. Yet, many jurisdictions

hardened their attitudes towards parole.  For example, the State of New York in 1978 repealed its

parole statute granting a liberty interest in parole, in favor of one in which no liberty interest was

afforded.  Thus, it appears that while the rehabilitation model of indeterminate sentencing was

retained for very serious crimes, the nature of those crimes caused a head-on clash with the now-

popular retributive model.  As a consequence, petitioner, as he is repeatedly evaluated for parole,

is caught between the retribution and rehabilitation models as parole officials struggle with the

remarkable transformation of the petitioner matched against the heinousness of his crime–said

another way, he is caught between the proverbial rock and a hard place.

Robles, in the context of his appearances before the Parole Board during his 46-plus years

of incarceration, faced a dynamic process which evolved, shifted and changed beneath him over

his 26 years of parole eligibility. Petitioner undoubtedly has faced many different parole boards

with a variety of commissioners, with each commissioner also undoubtedly bringing his or her

own views to bear on the parole process. Most of them appeared to unforgiving in their analysis

of the psyche of petitioner, as evidenced by their comments and loaded questions during the

hearings, as well as their written decisions. Overall, the Parole Board's collective response, over

the 12 parole hearings in the last 26 years of petitioner's parole eligibility, has been to interpret

petitioner's remarkable institutional achievements during his custody as unsuccessful efforts at

rehabilitation, as evidenced by their repeated reference to his dangerousness and that parole

would "deprecate the gravity and seriousness of the crime."

It is clear that the commissioners have not been enthusiastic about releasing petitioner,

given the highly charged publicity and strong community opposition to his release. Thus, this parole process progression has been fraught with difficulty for petitioner as he has struggled to explain, somewhat inarticulately, to the various parole boards his own evolution from heroin addict and out-of-control recidivist to a remarkably rehabilitated and productive inmate. For example, petitioner was complimented in his 1986 parole hearing by a parole commissioner to the effect that "we couldn't have had a much better inmate; haven't had a ticket in the last 10 years; you appear to be well liked by the inmates . . . . I have not found anything negative about you in here . . . .". He also was involved in the inmate's Liaison Committee and working with the Fortune Society, a prisoner re-entry organization. Robles explained that he had gotten an education, and wished to pursue teaching art (he had taught both art and photography while in prison). He also was recognized for his assistance in a positive way to other inmates in the institution, including the holding of counseling sessions. He had initiated a Narcotics Anonymous group, and "[v]arious TA [transactional analysis therapy] groups," as well as a computer club. *Id.* He also had 57 credits towards an associate's degree, and had pursued courses in welding, electronics, and was, as the parole commissioner noted, "a very skilled artist." *Id.* at 26. Robles explained that it had been his "plan to help when I get out, to help others," including youth. He had been offered a job at the Fortune Society two years before, but had been unable to accept because he was denied parole. He had been accepted into the Cephas Program in Rochester, New York, a "structured release program prior to his 1994 parole hearing." He also had married a woman and had stable relationship with her until her untimely death. His mental status reports, the first one of which was conducted in 1986, did "not provide any contraindication to [his] release."

Notwithstanding the positive opinions concerning his psychiatric health and lack of dangerousness, the Parole Boards have been extremely suspicious of his mental state. Frequently, Robles' attempts to convince the commissioners that he had accepted responsibility for his actions and that he was remorseful for what he had done was turned against him and misinterpreted, and as a result, no explanation of his insight into his crime seemed to be good enough for any of the 12 parole boards he faced. For example, in his 1986 parole hearing, the one hearing where it appears he came closest to a parole grant, he offered as a final comment, "I am sure killing is terrible. What I did no doubt about it. I have lived with it a long time. It hurts. In my heart I know I did not maliciously kill. Not insanity, but close to it; that it wasn't malicious." It appears that his clear intent was to convince the commissioner's he was not a dangerous person any longer and not the enraged out-of-control person who committed such a heinous crime. He seemed to want to convince the commissioners that while the crime was horrible, he could not have been motivated by maliciousness, but rather was out of his mind at that time, seemingly in an effort to convince them that he was now and is a good person. In short, he was trying to separate his present self from the person he once was and that he was no longer dangerous. While it is impossible on the available record to tell whether this comment cemented his fate with the commissioners, it appears that they took his comment as another example of avoiding responsibility for the crime. Plainly, the parole commissioners are unable to reconcile petitioner's rehabilitation and psychological growth with the gravity of his crimes and their personal feelings of revulsion about those crimes. Their practice has been to subjectively interpret petitioner's inartful attempts at demonstrating his insight into his crime and his acceptance of responsibility for it in exactly the opposite way petitioner intended.

At his 1987 parole hearing, as set forth above, in an apparent attempt to explain his recognition of his culpability, Robles attempted to explain why he did not admit to the killings earlier, stating that in 1984, when he first came up for parole, several prisoners at Auburn were killed in an unrelated incident. Robles said he was being threatened by other inmates at the time; he said that he explained the situation to his attorney. The attorney told Robles that he could maintain his innocence, "on advice of counsel". Robles said that he "jumped on" that advice because he "felt threatened" by the situation at the prison, and that it "was callousness" on his part to maintain his innocence. He further went into extensive, revealing personal details attempting to demonstrate to the Board the insight he had gained through therapy and through his recovery from drug addiction and his acceptance of his guilt for the crime. Using terms such as " remorse," "horror and disgust with himself," and that he "started hating [him]self from that moment," he revealed that he had "nightmares" over the incident. As mentioned above, it was apparent that the parole board members viewed everything Robles said with skepticism . They apparently did not believe he had sufficiently internalized responsibility for his crime, since he did not start discussing the crime in therapy until several years beforehand. In denying parole, the Board stated, among other things, that the "nature and circumstances of the current offenses, 2 counts of Murder 1°, wherein 2 young women were brutally stabbed to death, one sexually abused and her naked body tied to the clothed body of the other victim," and "given the nature of the crime and the prior criminal history discretionary release cannot be considered ." Only one remark in their conclusion related to his efforts at rehabilitation: " Note is made of your institutional efforts and achievements."

At his 1988 parole hearing, the Parole Board while stating that: "Your offense involves

the brutal murder of two women in their home in the course of a burglary in which you were interrupted. You tied the unclothed body of one of the victims to the clothed body of the other after having sexually abused her. You were on parole supervision when this crime occurred," they denied parole with the terse comment, "[while] the progress and accomplishments you have achieved while incarcerated, particularly in the last several years, are noted, it is the judgment of this panel that parole should be denied at this time."

At his 1990 parole hearing, Robles apparently stated that he feared ever putting himself in the situation he was in at the time of the murders, perhaps in an effort to convince the board that he will never do so and will vigilantly law-abiding if released. The Parole Board reacted by turning this soul-searching against him and mischaracterized his words in their denial of release: "So violent was your murder of two women during the commission of a burglary while on parole for three months. . .[y]ou cite in your presentation the fear of ever putting yourself in an unpredictable situation and, as those life situations are a reality, we believe your community release is not in the best interests of society. And with respect to Robles' rehabilitative efforts, the Parole Board found that the violence of his crime did "not offset the exceptional contributions you have made during these 26 years of imprisonment."

At his 1992 parole hearing, the Parole Board decided the outcome by stating: "the extreme gravity of the instant offense, the wanton murder of two young women during the course of a burglary, precludes early release. The inmate was on parole at the time of the commission of this crime. The Board then stated: "[t]he inmate has an outstanding institutional adjustment and we have attempted to consider that fact in our recommendation.

In his 1994 parole hearing when asked if he had targeted women, matters went downhill. After explaining that he was in the wrong place at the wrong time, a cliché for a crime caused by opportunity, not planning, the commissioners reacted negatively by stating, "[E] even though you have acknowledged responsibility, you might still be struggling with your internalization of guilt. Does it occur that way to you[,]" a conclusion he denied. During the same session, when he expressed "tremendous" empathy for the victims of crime and used his own experiences as a victim of crime (in his perception) to prove that he understood the feelings of victims and by inference his regret for the crime, the commissioners viewed his comments negatively by stating their concern that he saw himself as a victim–a devastating blow to one seeking parole. When he stated that the crime "never had to happen" because it escalated from a burglary, so as to indicate his regret for his acts, it is almost certain this was seen as his shifting of responsibility for the crime to his victims. After praising petitioner for his exceptional conduct in prison, in denying parole, the Board stated: "Though you verbalize remorse, you continue to struggle with acceptance of responsibility for your conduct. You presented various rationalizations for your behavior, and continue to self-identify as a crime victim. You are comfortable with shifting the genesis of your criminal behavior to causative factors and entities external to yourself. No genuine remorse or compassion or compassion [sic] for the victims was ascertainable."

Beginning with his 1996 parole hearing, the board appeared to resort to pro-forma denials when it stated "[i]n the August 1963 crime, you encountered two young women in their apartment, bound them to each other and viciously stabbed your immobilized victims. Previously you had forced sexual contact upon one of the victims. Your multiple stabbing of both victims while they were bound suggests a rage and uncontrolled anger that, along with your previously-

established pattern of willingness to risk confronting victims in their homes is of great concern to us. . . We note your extremely positive adjustment as an inmate in terms of behavior and program efforts, and we note your plans for release and the availability of support in the community. We also note your age and the length of your confinement. Still, given the other factors cited above, we are concerned that return to the community entails too great a risk of return to the negative behavior that led to the 1963 brutalization and deaths of two young women."

In his 1998 hearing, the parole board stated: "Further, discretionary release would deprecate the gravity and seriousness of the crime. This determination has been made after a review of your entire case file and in consideration of today's interview. Finally, it is noted that you were under parole supervision when instantly [sic] involved. We note your accomplishments while incarcerated, and they have been considered when arriving at today's decision."

In his 2000 hearing, the Parole Board stated: "Parole is again denied due to the violent and heinous nature of the I.O. [instant offense], murder 1st (2 counts), wherein you raped and sodomized one victim and stabbed to death two defenseless women. We note all your positive programming throughout the years and community support but find more compelling, your total disregard for the life of others."

In Robles' May 2002 parole interview the Parole Board questioned him about (1) the facts and circumstances of the crimes for which he was convicted; (2) his motive for committing those crimes; (3) his work at the prison since his last parole interview; (4) the amount of contact he had with people outside the prison; (5) how and where he would live after release from prison; and (6) whether he believed he had paid his debt to society. *See* Resp't Ex. CC, Transcript of

May 7, 2002 Parole Interview. Although the Parole Board during the interview paid lip-service to the statutory factors, the conclusion is inescapable that the Parole Board relied solely on the nature of the crime. The Parole Board referred to Robles' "conduct in committing the vicious crime" and the fact that he was on parole when he committed the crime. "The seriousness of the crime, of course, may be considered by the Board, but the "conviction *per se* should not preclude parole, there must be a showing of some aggravating circumstances beyond the inherent seriousness of the crime itself." *Matter of Weinstein v. Dennison,* 2005 WL 856006, at *7 (citing *Matter of King*, *supra* at 433, 598 N.Y.S.2d 245; *Phillips v. Travis*, N.Y.Law J., March 15, 2005, at 18, col. 3 (S.Ct., N.Y.Co.) (Schlesinger, J.);

The Parole Board concluded that Robles' "*overall* conduct" made him an "[un]acceptable candidate for discretionary release." *See* Resp't Ex. CC, Resp't Ex. DD (emphasis supplied). Given Robles' undisputedly commendable institutional record and exemplary conduct during his decades of incarceration, this statement by the Parole Board is, in this Court's opinion, "irrational" and its "determination was, thus arbitrary and capricious[.]" *Rios v. New York State Division of Parole*, No. 31731/06, 15 Misc.3d 1107, 836 N.Y.S.2d 503, 2007 N.Y. Slip Op. 50529 2007 WL 846561, at * (N.Y. Sup. Ct. Mar. 12, 2007) (unreported opn.) (citing *Matter of Silmon v. Travis*, 95 N.Y.2d 470, 476 (N.Y. 2000)). Although parole board may consider the severity of crime, its role is to evaluate inmate's danger to society in light of his comportment during incarceration, not to resentence him. *Cappiello*, 6 Misc.3d 1010A. The Court observes that in this case the successive parole boards considering Robles' case have effectively resentenced Robles from the indeterminate sentence of 20 years to life, to a sentence of life without possibility of parole.

At his 2004 hearing, the Parole Board stated "While the panel notes your positive program adjustment, due to the extremely serious and violent nature of these crimes, the panel concludes that your release would not be appropriate at this time."

At his 2006 hearing, the Parole Board stated, "the incredibly heinous and brutal nature of your offenses, and your past criminal behavior clearly indicate your are a poor candidate for release. Note is made of your programming and clean disciplinary record. Parole is denied."

I seriously doubt that the parole authorities of New York will ever properly exercise the discretion with which they are invested in determining parole in Robles case because it is doubtful that Robles will ever be able to articulate his remorse satisfactorily to this parole board. This is because the Court doubts that the parole board has any genuine interest in seeing Robles ever released–for them it is a lose-lose proposition. In this high profile case, one that still generates considerable public interest, and where the relatives of the deceased victims understandably want Robles to spend the rest of his life behind bars, it appears that the parole boards will continue to interpret and even twist every explanation of insight and remorse offered by Robles, and ignore the psychological evaluations attesting to his lack of dangerousness, to maintain him behind bars. Given petitioner's remarkable, indeed, extraordinary rehabilitation, his continued incarceration is purely retributive. The unfortunate consequence of the Parole Board's misguided approach is to rob inmates of hope, promote despair, discourage personal growth, and strip them of any incentive to discover insight or to seek redemption, in addition to perpetually burdening the courts and correctional institutions with inmates who have been truly rehabilitated and who could be productive citizens.

This Court cannot grant habeas relief, however, no matter how strong its disagreement, when the question has been decided by the state court on a pure matter of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991); 28 U.S.C. § 2254(a). On habeas review, the proper question that must be asked and answered by the district court is whether the state court's adjudication involved an unreasonable application of Supreme Court precedent.

### C.     Substantive Due Process

After reviewing Robles' allegations, the Court finds that his claim also sounds in substantive due process, perhaps even more so than procedural due process. This is because he essentially challenges the outcome of the parole proceeding as incorrect and unfair: "Fairness of result is a question of substantive due process." *Neuwirth v. Louisiana State Bd. of Dentistry*, 845 F.2d 553, 558 (5th Cir. 1988).  *See also  Davis v. Wilson*, Civil Action No. 08-589, 2009 WL 688912, at *9 (W.D. Pa. Mar. 12, 2009) (plaintiff-inmate's complaint in civil rights action under 42 U.S.C. § 1983 alleged that prison officials "arbitrarily and capriciously den[ied] prisoners" their requests to call witnesses at prison disciplinary proceedings; district court found that, "[l]iberally construing Plaintiff's complaint in light of these arguments," "Plaintiff is making a substantive due process claim") (citing *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1374 (11th Cir. 1993) ("The reason a substantive due process claim is also called an 'arbitrary and capricious due process claim' is because a showing that the government has acted arbitrarily and capriciously is a prerequisite for such a claim."); *see also  Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) ("[Plaintiff-inmate] Shamsid-Deen also alleges that the defendants improperly and arbitrarily placed him in keeplock pending his disciplinary hearing, a claim rejected by the magistrate judge. We construe this contention as raising a substantive due process challenge, and

we conclude that Shamsid-Deen's administrative confinement did not violate his right to substantive due process.").

The Fourteenth Amendment's guarantee of due process has as its core the protection of the citizen against arbitrary government action. *County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992) (noting that the plaintiff "relie[d] on the substantive component of the Clause that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them") (quoting *Daniels v. Williams*, 474 U.S. 327, 331(1986)). The Court, *supra*, noted the apparent tension between the Legislature's findings that Exec. Law § 259-i must be administered consistently with due process principles and the courts' conclusions that parole applicants have no due process rights in New York. A further incongruity lies in the fact that the New York state law standard for overturning a Parole Board decision ("arbitrary and irrational") is in all respects the same as the constitutional standard ("arbitrary and capricious") for a due process claim.

"[T]he Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing *unintended* injury to life, liberty or property." *Davidson v. Cannon*, 474 U.S. 344, 347 (1986) (citing *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (emphasis added). The Second Circuit has summarized the Supreme Court's precedents in this area, explaining that

> [s]ubstantive due process protects individuals against government action that is arbitrary, *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); *United States v. Certain Real Property and Premises*, 954 F.2d 29, 33 (2d Cir.), *cert. denied*, 506 U.S. 815, 113 S.Ct. 55, 121 L.Ed.2d 24 (1992),

conscience-shocking, *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952); *Doherty v. Thornburgh*, 943 F.2d 204, 209 (2d Cir.1991), *cert. dismissed sub nom. Doherty v. Barr*, 503 U.S. 901, 112 S.Ct. 1254, 117 L.Ed.2d 485 (1992), or oppressive in a constitutional sense, *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 196, 109 S. Ct. 998, 1003, 103 L.Ed.2d 249 (1989); *Interport Pilots Agency v. Sammis*, 14 F.3d 133, 144 (2d Cir.1994), but not against government action that is 'incorrect or ill-advised,' *Bishop v. Wood*, 426 U.S. 341, 350, 96 S. Ct. 2074, 2080, 48 L. Ed.2d 684 (1976); *Interport Pilots*, 14 F.3d at 144. Moreover, government action might be so arbitrary that it violates substantive due process 'regardless of the fairness of the procedures used.' *Foucha v. Louisiana*, 504 U.S. 71, ___ , 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992); *Daniels*, 474 U.S. at 331, 106 S.Ct. at 665; *Interport Pilots*, 14 F.3d at 144.

*Lowrance v. Achtyl*,  20 F.3d at 537.

The Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S. at 125 (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-26 (1985)). *Collins* explained that is "important, therefore, to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake," as an initial matter, when conducting a due process analysis. *Id.* . In *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), the Supreme Court reiterated *Collins*' cautionary observation:

> [W]e "ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field."

521 U.S. at 720 (quoting *Collins v. City of Harker Heights*, 503 U.S. at 125; citation omitted) (alterations in *Glucksberg*)); *accord*, *e.g.*, *Kia P. v. McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000

("The substantive due-process guarantee . . . 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'") (quotation omitted). The Supreme Court observed in *Glucksberg* that its "established method" of analyzing substantive due process claims "has two primary features":

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively,"deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed[.]" Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest.

*Glucksberg*, 521 U.S. at 721 (internal quotations and citations omitted).[11]

Substantive due process offers only limited protections and only guards against the exercise of arbitrary and oppressive government power. *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The Supreme Court has held that a convicted petitioner has no right to release from prison before the expiration of a valid sentence. Clearly, then, the possibility of parole release cannot qualify as one of the "fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept

---

[11]    Prior to *Collins* and *Glucksberg*, the majority of other circuits had interpreted the Supreme Court's case law to mean that the absence of a property or liberty interest is fatal to a substantive due process claim. *E.g, Clark v. Whiting*, 607 F.2d 634, 641-42 n. 17 (4th Cir.1979); *Sullivan v. Brown*, 544 F.2d 279, 282 (6th Cir.1976); *Weathers v. West Yuma County School District R-J-1*, 530 F.2d 1335, 1340-41 (10th Cir.1976); *Buhr v. Buffalo Public School District No. 38*, 509 F.2d 1196, 1202-03 (8th Cir.1974); *Perkins v. Board of Directors of School Administrative District No. 13*, 686 F.2d 49, 51 n. 5 (1st Cir.1982) (stating that "plaintiff's [substantive due process] claim would fail on our determination that she had no constitutionally protected property interest"); *Swartz v. Scruton*, 964 F.2d 607, 609 (7th Cir.1992); *Garza v. Miller*, 688 F.2d 480, 485 (7th Cir.1982). "In other words, no abstract right to substantive due process exists under the Constitution." *Zorzi v. County of Putnam*, 30 F.3d 885, 895 (7th Cir.1994). Consequently, the lack of a protected property interest is fatal to a substantive due process claim. *Id.* at 894."). *See also see also General Auto Service Station v. City of Chicago*, 526 F.3d 991, 1002 (7th Cir. 2008) ("Intrusion upon a cognizable property interest is a threshold prerequisite to a substantive due process claim of the type that GASS asserts. *See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59, 119 S.Ct. 977, 989, 143 L.Ed.2d 130 (1999) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"); *Gordon v. Alexander*, 592 F. Supp.2d at 653 & n.56 (citing *Monroe v. Thigpen*, 932 F.2d at 1442).

of ordered liberty,' such that neither liberty nor justice would exist if they were sacrificed,'"
*Glucksberg*, 521 U.S. at 721 (quotations and citations omitted).  Furthermore, as discussed above
in this Decision and Order, the Second Circuit has explicitly held that New York's parole
scheme, as embodied in Exec. Law § 259-i does not create a liberty interest entitling the inmate
to procedural due process protections since the statute "is not one that creates in any prisoner a
legitimate expectation of release." *Barna*, 239 F.3d at 171; *see also Marvin v. Goord*, 255 F.3d.
40, 44 (2d Cir. 2001); *accord, e.g.*, *Defino v. Thomas*, No. 02 Civ. 7413(RWS), 2003 WL 40502,
at *3 (S.D.N.Y. Jan. 2, 2003). Based upon these two clearly established principles obviating the
possibility of any type of liberty interest in parole, this Court is hard-pressed to provide the
required "careful description" of the right to be protected by substantive-due-process, as directed
by *Glucksberg*, 502 U.S. at 721.[12]

Furthermore, even assuming that this Court is correct that the Parole Board has violated
New York state law, that does not necessarily warrant the invocation of substantive due process
protection. The Supreme Court's decision in *Collins* is instructive. There, the widow of city
sanitation department employee who died of asphyxia after entering a manhole to unstop a sewer
line brought a civil rights action under 42 U.S.C. § 1983 against the city. The lower courts found

---

[12]     In the context of allegations that there has been an abusive exercise of a state's executive power,
the Supreme Court has employed the following test to ascertain a valid substantive due process violation: "[W]hether
the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the
contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d
1043 (1998) (examining the levels of culpability that might satisfy the "shocks the conscience" standard for gauging
constitutionality of , and ultimately issuing a narrow holding–that "high-speed chases with no intent to harm suspects
physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by
an action under [42 U.S.C.] § 1983"). In any event, *Lewis* is not applicable here, since it  "expressly confines its
holding to the circumstances of high-speed police chases." *Newell v. Kuryan*,  155 F. Supp.2d 402, 405(E.D. Pa.
2001) (citing *Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 372 (9th Cir. 1998) ( "[T]he Supreme
Court limited its holding in Lewis to the facts of that case i.e., to high-speed police chases . . .").

that the widow had failed to state a constitutional claim and dismissed the Section 1983 suit. The

Supreme Court agreed, holding that the city's alleged failure to train or warn its employees about

known hazards in the workplace did not violate the due process clause as the allegations did not

state anything more than a possible tort claim. The Supreme Court assumed that the plaintiffs had

demonstrated a violation of state law, the Texas Hazard Communication Act, which imposed a

duty on the city to warn its sanitation employees about the dangers of noxious gases in the sewers

and to provide safety training and protective equipment to minimize those dangers. 503 U.S. at

129 (footnote omitted). The Supreme Court also assumed that the Texas statute created an

entitlement that qualified as a "liberty interest" protected by the Fourteenth Amendment's due

process clause–unlike the parole statute in New York. Nevertheless, the *Collins* court held, a

violation of that act did not support the widow's substantive due process claim. *Id.*

> But even with these assumptions, petitioner's claim must fail for she has not
> alleged that the deprivation of this liberty interest was arbitrary in the
> constitutional sense. *Cf. Harrah Independent School Dist. v. Martin*, 440 U.S.
> 194, 198-199, 99 S.Ct. 1062, 1064-1065, 59 L.Ed.2d 248 (1979). The reasons
> why the city's alleged failure to train and warn did not constitute a constitutionally
> arbitrary deprivation of Collins' life, *see supra*, [112 S.Ct.] at 1070, apply a
> fortiori to the less significant liberty interest created by the Texas statute.

*Collins*, 503 U.S. at 129. In *Harrah*, the case cited by *Collins*, the plaintiff was a tenured

schoolteacher whose contract had not been renewed. The Supreme Court observed,

"Relying on the Fourteenth Amendment's protection of the "substantive aspects" of "life,

liberty, and property," the [Tenth Circuit] Court of Appeals held, apparently, that the

School Board's decision to substitute the sanction of contract nonrenewal for the sanction

of withholding routine pay increases was so 'arbitrary' that it offended 'notions of

fairness' generally embodied in the Due Process Clause." 440 U.S. at 198. That plainly

was insufficient for the *Harrah* court, which noted the critical lack of any claim "that the interest entitled to protection as a matter of substantive due process was anything resembling 'the individual's freedom of choice with respect to certain basic matters of procreation, marriage, and family life.'" *Id.* (citations omitted).

The Court recognizes that a number of district courts in this Circuit considering habeas claims similar to Robles' arguments have essentially performed a substantive due process analysis. After concluding that the absence of a liberty interest means that the petitioner has not stated a procedural due process claim, and in any event, the Parole Board followed the correct *procedures* set forth by New York law, which certainly meet the minimum requirements of procedural due process under *Greenholtz* and *Allen,* the district courts have proceed to analyze the substantive basis of the Parole Board's decision denying release to the habeas petitioner. *E.g.*, *Cartegena v. Connelly*, No. 06 Civ.2047(LTS) (GWG), 2006 WL 2627567, at *7 (S.D.N.Y. Sept. 14, 2006) (noting that some courts in this Circuit have stated that despite the lack of a definable liberty interest created by New York's parole statute, "there may be a violation of the Due Process Clause–sometimes but not always identified as 'substantive due process'–if the Parole Board has denied release 'arbitrarily or capriciously.'") (collecting cases);[13] *see also Manley v. Thomas*, No. 02 Civ. 9754(VM), 2003 WL 1739003 at *3 (S.D.N.Y. Apr. 1, 2003) (citing *Meachum v. Fano*, 427 U.S. at 226); *Bell v. Anderson*, No. 06-4558, 301 Fed. Appx. 459,

---

[13]     *Cartegena* cites, as examples, *inter alia*, *Siao-Pao v. Mazzuca*, 442 F. Supp.2d 148, 154 (S.D.N.Y. 2006); *Morel v. Thomas*, No. 02 Civ. 9622(HB), 2003 WL 21488017, at *4 (S.D.N.Y. June 26, 2003) ("Thus, because a New York law does not create a liberty interest in parole, Morel's due process rights extend only to a refusal by the Parole Board to deny release arbitrarily or capriciously, based on inappropriate consideration of a protected classification or an irrational distinction, or on any other unconstitutional grounds.") (citing *Manley v. Thomas,* 2003 WL 1739003 at *3 (S.D.N.Y. Apr.1, 2003) (citing *Meachum v. Fano*, 427 U.S. at 226)). *See also Bottom v. Pataki*, No. 9:03 Civ. 835, 2006 WL 2265408, at *5 (N.D.N.Y. Aug. 7, 2006) ("[A]n inmate may only bring a due process claim if the denial of parole is either arbitrary or capricious.").

*462 (6th Cir. Nov. 18, 2008) ("The other group of cases on which [petitioner inmate] Bell relies spring from opinions in the Third and Eighth Circuits in which the courts found due process violations on the basis of 'totally arbitrary parole decisions' even in the absence of an identifiable liberty interest in parole release.") (citing *Burkett v. Love*, 89 F.3d 135, 139-40 (3d Cir.1996) (holding that allegation of retaliatory parole denial on the basis of prisoner's exercise of his constitutional rights stated a cognizable claim on federal habeas review); *Thompson v. Armontrout*, 808 F.2d 28, 31 (8th Cir.1986) (holding that the parole board's retaliatory denial of parole was a due process violation; however, court did not identify the particular liberty interest at stake, but rather limited its holding to the facts of the case).

For example, the petitioner in *Tatta* argued that the denial of his parole application violated the Due Process Clause, but did not specify whether he was claiming a procedural due process violation, a substantive due process violation, or both. *Tatta*, 2005 WL 2806236, at *3.Observing that the Due Process Clause had both procedural and substantive components, *id.* (citing *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005),[14] the district court in *Tatta* decided to address both, out of "an abundance of caution[.]" *Id.* In doing so, a number of district courts have expressed concerns about the correctness of the Parole Board's denials. However, the courts have all concluded, *e.g.*, that since the Parole Board *considered* the statutorily articulated factors and that "[d]enial of parole is neither arbitrary nor capricious when the Parole Board

---

[14]     *See also Pittsley v. Warish*, 927 F.2d 3, 6 (1st Cir. 1991) ("Due process claims may take either of two forms: 'procedural due process' or 'substantive due process.' *See generally Hall v. Tawney*, 621 F.2d 607, 610-13 (4th Cir.1980). Procedural due process requires that the procedures provided by the state in effecting the deprivation of liberty or property are adequate in light of the affected interest. Substantive due process, however, imposes limits on what a state may do regardless of what procedural protection is provided.") (citing *Monroe v. Pape*, 365 U.S. 165, 171-72 (1961); *Rochin v. California*, 342 U.S. 165, 169 (1952)).

relies on the factors defined by New York statute." *Romer v. Travis*, 2003 WL 21744079, at *6; *accord, e.g.*, *Tatta v. Miller*, 05-CV-1205 (FB)(MG), 2005 WL 2806236, *3 (E.D.N.Y. Oct. 27, 2005). The district courts' use of what they denominate as an "arbitrary and capricious" standard to gauge the constitutionality of a parole denial suggests that essentially a substantive due process analysis is being performed.

Some district courts have also considered the denial-of-parole claims under what appears to be both a substantive due process test and an equal protection test, stating that a habeas petitioner-inmate's "only [liberty] interest in parole is in not being denied parole for *arbitrary or constitutionally impermissible reasons*." *Defino*, 2003 WL 40502, at *3 (emphasis supplied) (citing *Meachum v. Fano*, 427 U.S. 215, 226 (1976); *Block v. Potter*, 631 F.2d 233, 238 (3d Cir. 1980)).[15] *Block v. Potter*, 631 F.2d at 236 ("Even if a state statute does not give rise to a liberty interest in parole release under *Greenholtz*, once a state institutes a parole system all prisoners have a liberty interest flowing directly from the due process clause in not being denied parole for arbitrary or constitutionally impermissible reasons."). In *Block v. Potter*, the Third Circuit held that "the denial of parole may give rise to a substantive due process violation even though there

---

[15]     *See also, e.g.*, *Boddie v. New York State Div. of Parole*, 285 F. Supp.2d 421, 428 (S.D.N.Y. 2003) ("Boddie's liberty interest is therefore 'limited to not being denied parole for arbitrary or impermissible reasons.'") (quoting *Brown v. Thomas*, No. 02 Civ. 9257, 2003 WL 941940, at *1 (S.D.N .Y. Mar. 10, 2003) (in turn citing *Meachum*, 427 U.S. at 226); *Mathie v. Dennison*, No. 06 Civ. 3184(GEL), 2007 WL 2351072, at *6 (S.D.N.Y. Aug. 16, 2007) ("'An inmate's 'federally protected liberty interest in parole release is limited to not being denied parole for arbitrary or impermissible reasons.'"); *McLaurin v. Paterson*, No. 07 Civ 3482(PAC)(FM), 2008 WL 3402304, at *11 (S.D.N.Y. Aug. 11, 2008) ("The Due Process Clause nevertheless may be violated if parole is denied for arbitrary or impermissible reasons, such as reliance upon a protected characteristic or an irrational distinction.") (citing *Mathie v. Dennison*, 2007 WL 2351072, at *6); *Siao-Pao v. Mazzuca*, 442 F. Supp.2d 148, 154 (S.D.N.Y. 2006); *Morel v. Thomas*, No. 02 Civ. 9622(HB), 2003 WL 21488017, at *4 (S.D.N.Y. June 26, 2003)); *Morehouse v. Alexander*, No. 9:08-CV-0946 (LEK/GHL), 2008 WL 4822231, at *5 (N.D.N.Y. Nov. 3, 2008); *Almonte v. New York State Div. of Parole*, No. Civ. 904CV484GLS, 2006 WL 149049, at *2 (N.D.N.Y. Jan. 18, 2009) (petitioner's habeas "challenge is . . . limited to whether he was denied parole for arbitrary or impermissible reasons") (citing *Meachum*, 427 U.S. at 226)).

is not a liberty interest in parole," *Rauso v. Vaughn*, No. CIV. A. 98-CV-6312, 1999 WL 111474,

*1 (E.D. Pa. Mar. 2, 1999) (citing *Block v. Potter*, 631 F.2d 233). The Third Circuit in *Block*

described the right as follows: "Even if a state statute does not give rise to a liberty interest in

parole release under *Greenholtz*, once a state institutes a parole system all prisoners have a liberty

interest flowing directly from the due process clause in not being denied parole for arbitrary or

constitutionally impermissible reasons." 631 F.2d at 235.[16] The Third Circuit did not cite any

authority for that proposition. Although the *Block* court characterized the petitioner's argument

as a due process claim, given its use of the term "liberty interest", the facts of the suggest that it

was an equal protection issue. The petitioner in *Block* alleged that he was denied parole by the

Virgin Islands' parole board because of his economic status and his race (he was affluent and

Caucasian). To the extent that *Block* still has precedential value, it does not support Robles'

---

[16] Courts within the Third Circuit as well as courts from outside that circuit have criticized *Block*. Recently, in *Davis v. Wilson*, 2009 WL 688912, at *9 n.1, a district court in Pennsylvania "acknowledge[d] that even though 'the vitality of *Block* is questionable, it must be followed until overturned. *See Jubilee v. Horn*, No. 97-1755, slip op. at 1 (3d Cir. Mar. 26, 1998) (unpublished *per curiam* decision) ("[N]ot only do courts of appeals in other circuits disagree with *Block*, but more recent decisions by th[e] [Third Circuit] Court [of Appeals] suggest that *Block* may be obsolete."). In *Rauso v. Vaughn*, No. Civ. 98-6312, 1999 WL 111474, at *1 (E.D. Pa. March 2, 1999), questioned whether *Block* remained good law, but found in any event that petitioner had not "assert[ed] any conduct by defendants that might give rise to a cognizable substantive due process violation under *Block*–e.g., deprivations implicating 'race, religion, political beliefs, or on frivolous criteria with no rational relationship to the purpose of parole such as the color of one's eyes, the school one attended, or the style of one's clothing.'" *Rauso*, 1999 WL 111474, at *1 (quoting *Block*, 631 F.2d at 236 n. 2).

The Sixth Circuit in *Bell*, a § 2254 habeas case, rejected the petitioner's reliance on *Block*, observing that "the reasoning on which these cases are based has not been adopted in this circuit[,]" and "[m]oreover, that analysis has been criticized by other courts." *Bell*, 301 Fed. Appx. at 462 (citing *Blair-Bey v. Quick*, 151 F.3d 1036, 1048 n. 11 (D.C. Cir. 1998) (casting doubt on whether a due process claim may be recognized in the absence of an identifiable liberty interest); *Johnson v. Rodriguez*, 110 F.3d 299, 308 (5th Cir. 1997) ("It is therefore axiomatic that because Texas prisoners have no protected liberty interest in parole they cannot mount a challenge against any state parole review procedure on procedural (or substantive) Due Process grounds."); *Malek v. Haun*, 26 F.3d 1013, 1016 (10th Cir. 1994) (holding that in the absence of a liberty interest, prisoner is not entitled to due process protection); *Shirley v. Chestnut*, 603 F.2d 805, 807 (10th Cir. 1979) (holding that in the absence of a liberty interest, the "specific due process procedures requested by the appellants [we]re not applicable")).

District courts in this Circuit have noted *Block*'s holding but have not squarely addressed it: *E.g.*, *Defino v. Thomas*. ("The Court need not opine on whether the substantive due-process right described in *Block* exists because, even if it does, it was not violated in this case.").

equal protection claim: Robles, unlike Block, has not alleged that the Parole Board discriminated against him on the basis of race, ethnicity, or any other constitutionally impermissible basis.

In addition to *Block v. Potter*, the Supreme Court decision in *Meachum v. Fano*, 427 U.S. at 226, has been cited by some of these district courts for the proposition that a prisoner's "liberty interest is therefore 'limited to not being denied parole for arbitrary or impermissible reasons.'" The Court has carefully reviewed *Meachum* and has doubts as to whether it does stand for such a notion. *Meachum* concerned the involuntary transfers of prisoners from one institution to another. The inmates there contended that they had procedural due process rights in connection with such involuntary transfers. The Supreme Court held that "Massachusetts law conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct[.]" *Id.* Accordingly, in the absence of a protected liberty interest in staying at a given facility, the prisoners' due process claims could not stand. Noting that transfers "between Massachusetts prisons are not conditioned upon the occurrence of specified events," but rather "in a wide variety of circumstances [are] vested in prison officials[,]" the Supreme Court found that "[t]he predicate for invoking the [due process] protection of the Fourteenth Amendment as construed and applied in *Wolff v. McDonnell* is totally nonexistt [sic] in this case." *Meachum*, 427 U.S. at 227. The district court in *Meachum*, which had granted plaintiffs injunctive relief, returning them to the general prison population, had understood *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), to entitle the inmates to notice and hearing and had held both constitutionally inadequate in that case. The Supreme Court reversed.

The language from *Meachum* that the New York district courts apparently have relied upon in finding that a prisoner's "liberty interest is therefore 'limited to not being denied parole for arbitrary or impermissible reasons,'" actually appears to be a quotation taken from the *Wolff* decision: "The liberty interest protected in *Wolff* had its roots in state law, and the minimum *procedures* appropriated under the circumstances were held required by the Due Process Clause 'to insure that the state-created right is not *arbitrarily abrogated*.'" *Meachum*, 427 U.S. at 226 (quoting *Wolff*, 418 U.S. at 557)) (emphases supplied).

In *Wolff*, the Supreme Court had held that the state statute at issue had created a liberty interest entitling a state prisoner to certain procedural protections when he was deprived of good-time credits because of serious misconduct. The Supreme Court in *Wolff* explained,

> We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government, *Dent v. West Virginia*, 129 U.S. 114, 123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889). Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed.

418 U.S. at 448; *see also Meachum*, 427 U.S. at 226 (summarizing *Wolff*'s holding).

In contrast, in *Meachum*, the Supreme Court declined to find a state-created liberty interest and therefore concluded the protections of the Due Process Clause were not required before inmates were transferred between state prisons in Massachusetts. *Meachum* explained that the Massachusetts prison officials had "the discretion to transfer prisoners for any number of reasons" and this discretion was not limited to instances of serious misconduct. "Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves

himself, it is too ephemeral and insubstantial to trigger procedural due process protections as

long as prison officials have discretion to transfer him for whatever reason or for no reason at

all." *Id.* at 228. Absent a protected liberty interest, such as the one found in the state statute in

*Wolff*, the Due Process Clause did not require any minimum procedures to be followed by the

Massachusetts prison officials; as is the case with the New York parole system, there was no

state-created right under Massachusetts law which required minimum procedures to insure

against its being arbitrarily abrogated. *See Meachum*, 427 U.S. at 226-27.

Finally, the Supreme Court in *Meachum* expressed its clear reluctance to involve the

federal courts in prison administrative matters:

> Holding that arrangements like this [involving prisoner transfers] are within reach
> of the procedural protections of the Due Process Clause would place the Clause
> astride the day-to-day functioning of state prisons and involve the judiciary in
> issues and discretionary decisions that are not the business of federal judges. We
> decline to so interpret and apply the Due Process Clause. The federal courts do not
> sit to supervise state prisons, the administration of which is acute interest to the
> States.

*Meachum*, 427 U.S. at 228-29.

Even if *Wolff* were applicable here, it still does not stand for the proposition that simply

because a prisoner has a liberty interest requiring certain minimum procedures, he is guaranteed

of a certain result when those procedures are followed. Notably, *Wolff* did not discuss the

evidentiary standard against which the "reason for disciplinary action taken" in the factfinder's

written statement would, or could, be judged. Instead, certain *procedures* were held necessary

because of the liberty interest at stake in *Wolff*–and *Greenholtz*–to ensure that the "state-created .

. . right is not arbitrarily abrogated," *Wolff*, 418 U.S. at 556-57. The statements in *Boddie* and

*Brown* that an inmate's due process interest in parole is limited to not being denied parole for "arbitrary or impermissible reasons," seems to suggest that the inmate is guaranteed a certain result–in addition to having the procedures mandated by the Due Process clause followed. However, as the Supreme Court noted in *Greenholtz*, the Constitution required, in those cases where the state had created a liberty interest by statute, only that the state follow certain procedures–there was no constitutionally-mandated outcome. Here, as discussed above, New York inmates have no liberty interest in parole under the current New York statutory scheme.

In any event, this Court does not read *Meachum v. Fano* as standing for the proposition that New York inmates have a "limited liberty interest in not being denied for arbitrary or impermissible reasons." Rather, in *Meachum*, the Supreme Court reversed the district court's finding that the notice and hearing provided to the inmates were constitutionally inadequate; the *Meachum* court found that the inmates were not entitled to any particular procedures before being transferred–there was no "liberty interest" in Massachusetts with "its roots in state law," in contrast to the situation in *Wolff v. McDonnell*, where the state statute–not the federal constitution–had given rise to a liberty interest.

In this Court's opinion, Robles has an extremely strong claim under New York *State* law that the Parole Board acted arbitrarily and irrationally, although even State authorities are in conflict on the issue as to whether the New York's statutory scheme precludes the Parole Board from relying exclusively on the nature of the inmate's crime to deny parole. *Compare Thurman v. Hodge*s, 292 A.D.2d 872, 739 N.Y.S.2d 324 (App. Div. 4th Dept. 2002) (consideration of the serious and violent nature of petitioner's crimes comports with New York statutory parole

scheme); *Charlemagne v. New York Div. of Parole*, 281 A.D.2d 669, 670, 722 N.Y.S.2d 74, 75

(App. Div. 3d Dept. 2001) (Parole Board not required to give equal weight to each factor in

parole decision); *Garcia v. New York State Div. of Parole*, 239 A.D.2d 235, 239, 657 N.Y.S.2d

415, 418 (App. Div. 1st Dept. 1997) ("However, while the relevant statutory factors must be

considered, it is well settled that the weight to be accorded to each of the factors lies solely

within the discretion of the Parole Board (*see, Klein v. New York State Division of Parole*, 202

A.D.2d 319, 320, 609 N.Y.S.2d 208; *Matter of McKee v. New York State Board of Parole*, 157

A.D.2d 944, 945, 550 N.Y.S.2d 204; *People ex rel. Herbert v. New York State Board of Parole*,

97 A.D.2d 128, 133, 468 N.Y.S.2d 881)); *Farid v. Travis*, 239 A.D.2d 629, 629, 657 N.Y.S.2d

221, 221-22 (App. Div. 3d Dept. 1997); *King v. New York State Div. of Parole*, 598 N.Y.S.2d

245, 251 (App. Div. 1st Dept. 1993); *with Weinstein v. Dennison*, ("Nor was it appropriate for the

Board to focus solely on the 14 year old crime. Petitioner was properly sentenced by a court,

upon the recommendation of the district attorney and in keeping with the sentencing parameters

set forth by the legislature. The sentencing court decided an indeterminate term of imprisonment

of 7 to 21 years was appropriate, and the district attorney made clear at the plea proceedings that

its office believed the 7 year minimum sufficient in petitioner's case. The seriousness of the

crime, of course, may be considered by the Board, but the 'conviction per se should not preclude

parole, there must be a showing of some aggravating circumstances beyond the inherent

seriousness of the crime itself.'") (quoting *King*, supra at 433, 598 N.Y.S.2d 245 and citing

*Phillips v. Travis*, 6 Misc.3d 1041(A), 800 N.Y.S.2d 354 (Table), 2005 WL 701116 (N.Y. Sup.

Ct. Mar. 8, 2005) (granting Article 78 petitioner's application to annul respondent's

determination denying petitioner parole, and remanding the matter for a re-hearing before a

Parole Board comprised of different commissioners), *rev'd*, 21 A.D.3d 335, 800 N.Y.S.2d 397, 398 (App. Div. 3d Dept. 2005) ("Contrary to the finding of the motion court, respondent complied with the statutory mandate to consider certain guidelines in determining whether to release an inmate on parole. The Parole Board is not required to delineate in its decision each of the guidelines considered. The record reflects that petitioner was afforded a proper hearing in which only the relevant guidelines were considered. Where, as here, the sentencing court, and not the Board of Parole, has set the minimum sentence of imprisonment, those guidelines include the seriousness of the offense and the inmate's prior criminal record. Given the heinousness of petitioner's crime, the Board's denial of parole was neither arbitrary nor capricious.") (internal citations omitted); *Cappiello v. New York State Bd. of Parole*, 800 N.Y.S.2d 343 (Table), 2004 WL 3112629, at *7 (N.Y. Sup. Ct. Nov. 30, 2004) (granting inmate's Article 78 petition for reconsideration of parole denial on basis that the Board failed to take into account factors other than petitioner's "threat to public safety")); *Wallman v. Travis*, 794 N.Y.S.2d 381, 388 (App. Div. 1st Dept. 2005) ("[A]s the sole . . . basis for the [Parole] Board's denial was the seriousness of the offense, [the parole denial] was irrational bordering on impropriety.").

The district courts in this Circuit to have considered the issue have found that since New York's parole statute does not specify how much weight to be accorded to each factor, the "law does not forbid the Board from deciding that the seriousness of an offense and a prisoner's institutional record outweigh [other criteria]." *Salahuddin v. Unger*, 2005 WL 2122594, at *6; *see also Anthony v. New York State Div. of Parole*, No. 06 Civ. 180, 2006 WL 3859215, at *10 (S.D.N.Y. Jan. 4, 2006) (finding that New York law "allows the denial of parole based solely on the severity of the offense so long as there is 'a showing of some aggravating circumstances

beyond the inherent seriousness of the crime itself'") (quoting *King v. N.Y. State Div. of Parole*, 190 A.D.2d 423, 598 N.Y.S.2d 245, 251 (App. Div. 1ˢᵗ Dept. 1993), *aff'd*, 83 N.Y.2d 788, 610 N.Y.S.2d 954, 632 N.E.2d 1277 (N.Y. 1994)); *Davis v. Thomas*, 256 F.Supp.2d at 192; *Manley v. Thomas*, 255 F.Supp.2d at 266-67; *Brown v. Thomas*, 2003 WL 941940 at *2 (stating that "the [Parole] Board was fully entitled to determine that the nature of the crime outweighed the positive aspects of [petitioner's] record"); *Defino v. Thomas*, 2003 WL 40502 at *4 (finding petitioner's due process claim unlikely to succeed when the Parole Board looked to "the severity of [Petitioner's] offense" and petitioner's "'positive programming and community support'" and found that "the former outweighed the latter"); *Walters v. Ross*, No. CV-92-2290, 1992 WL 398307 at *3-4 (E.D.N.Y. Dec. 21, 1992) (denial of parole based on the severity of the prisoner's crime and his refusal to accept responsibility did not violate due process).

As this Court has observed, it cannot grant habeas relief on the basis of purely a violation of state law; the state law error must also rise to the level of a federal constitutional issue. *See* 28 U.S.C. § 2254(a). It is now beyond cavil that the federal constitution itself does not give rise to a liberty interest in an inmate being released before the expiration of a valid sentence. It is similarly well-established that New York's parole statute does not create a liberty interest in parole release. From where, then, can a federal constitutional right be derived so as to entitle a habeas petitioner to review of his claims?

Even a cursory reading of the Supreme Court's and the Second Circuit's case law leaves no doubt that the scope of substantive due process is very limited. *See Washington v. Glucksberg*, 521 U.S. at 721. "Substantive due process is an outer limit on the legitimacy of governmental

action. It does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action." *Natale v. Town of Ridgefield*, 170 F.3d 258, 262 (2d Cir. 1999). As discussed above, denial of parole in New York is this type of governmental action that is redressable in a state court proceeding—namely, an Article 78 petition, which is the procedural vehicle in New York for challenging the propriety of administrative actions. Nevertheless, "state courts may not interpret their law in such an arbitrary manner that the interpretation is nothing but an evasion of the federal due process requirements, minimal as they may be." *Evans v. Carey*, No. CIV S-06-0376 LKK GGH P, 2006 WL 1867534, at *5 (E.D. Cal. July 5, 2006 ) (quoting *Peltier v. Wright*, 15 F.3d 860, 862 (9th Cir.1994) ("[W]e are bound by the state's construction [of state laws] except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue.") and citing *Oxborrow v. Eikenberry*, 877 F.2d 1395, 1399 (9th Cir.1989) ("Our deference to the [state] Court is suspended only upon a finding that the court's interpretation [of state law] is untenable or amounts to a subterfuge to avoid federal review of a constitutional violation.")).

Without in any way meaning to minimize the grievous injustice suffered by the victims in having their lives cut short in such a brutal manner, this Court firmly believes that the Parole Board's treatment of Robles in the latter stages of his parole treatment has been contrary to New York law and manifestly unfair. Despite this unfairness, and despite the equitable nature of the habeas remedy, this Court's reach does not extend so far as to being able to right the wrong that it believes has been committed in the Parole Board's plainly arbitrary denial of parole–there is no exercise of discretion where, as here, the results of the decision-making process are pre-

determined. As can be seen by a review of the Parole Board's decision, the language has changed somewhat over the years and the denials have become briefer–yet the first Parole Board's decision is essentially the same as that of the most recent Parole Board to judge Robles: Each Parole Board, at the end of the day, relied upon the nature of the Robles' crimes as the sole basis for denying release, with articulating a nexus between this static, unchanging factor and his current parole risk. *Compare with Rosenkrantz v. Marshall*, 444 F. Supp.2d at 1081-82 ("In the circumstances of this case, the [California Board of Prison Terms'] continued reliance upon the nature of petitioner's crime to deny parole in 2004 violated due process. First, continued reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest. Petitioner had been denied parole on six occasions prior to the determination he now challenges. Continued reliance upon the unchanging characterization of petitioner's offense amounts to converting petitioner's sentence of seventeen years to life to a term of life without the possibility of parole.") (citing *Johnson v. Finn*, No. CIVS050385DFLGGHP, 2006 WL 195159, at * 8 n. 3 (E.D. Cal. 2006) (stating that "the seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)."); *Irons v. Carey*, 358 F. Supp.2d at 947 n. 2 (E.D. Cal. 2005) ("To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after fifteen or so years in the caldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner

does not possess those attributes, the predictive ability of the circumstances of the crime is near zero."), *overruled on other grounds*, 505 F.3d 846, 850 (9th Cir. 2007); *Biggs v. Terhune*, 334 F.3d 910, 916-17 (9th Cir. 2003) (*in dicta*, stating that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation"), *overruled on other grounds*, *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (*en banc*).

The Court, however, is mindful of the precept that "'[f]ederal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'" *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Given the cautiousness with which the Supreme Court and other federal courts have approached the substantive due process area, this Court cannot say that the Appellate Division's rejection of Robles' due process claim was contrary to, or an unreasonable application of, clearly established Federal law as defined by the Supreme Court.

## B.     Violation of the *Ex Post Facto* Clause (Claim One)

The United States Constitution provides that "[n]o state shall . . . pass any . . . *ex post facto* law." U.S. CONST. art. I, § 10, cl. 1. The *ex post facto* clause, made applicable to the states through the Fourteenth Amendment, prohibits the enactment of "any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" *Weaver v. Graham*, 450 U.S. 24, 28 (1981)

(quoting *Cummings v. Missouri*, 4 Wall. 277, 325-326 (1867)); *see also Beazell v. Ohio*, 269 U.S. 167, 169-170 (1925). In other words, the clause prohibits laws that "'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *Lee v. Governor of the State of N.Y.*, 87 F.3d 55, 59 (2d Cir. 1996) (quoting *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)); *see also Weaver*, 450 U.S. at 29. The challenged law need not impair a "vested right" in order to be *ex post facto*; a violation may occur when the law "merely alters penal provisions accorded by the grace of the legislature [.]" *Weaver*, 450 U.S. at 30; *accord*, *e.g.*, *Lee*, 87 F.3d at 59.

If a statute is merely "procedural" and does not affect the quantum of punishment attached to the crime, there is no *ex post facto* violation even when the statute is applied retroactively. *Dobbert v. Florida*, 432 U.S. 282, 293 (1977) ("Even though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto*.") (citing *Hopt v. Utah*, 110 U.S. 574 (1884)). The purpose of the *ex post facto* clause is not to guarantee a right to less punishment, but rather "serves both to assure that legislative acts give fair warning about new punishments and to discourage arbitrary and oppressive legislation." *DiNapoli* (citing Weaver, 450 U.S. at 28-29); *Dobbert*, 432 U.S. at 298; *see also Dobbert*, 432 U.S. at 294 (holding that the change in the statute was "clearly procedural" where it "simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime;" noting that "'[t]he crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute . . .'") (quoting *Hopt*, 110 U.S. at 589-90).

The Second Circuit has spoken directly on the *ex post facto* issue raised by Robles in the present habeas petition. *See Barna v. Travis*, 239 F.3d 169 (2d Cir. 2001). The plaintiffs in *Barna v. Travis* were inmates who asserted that application of the parole procedures adopted by the New York Legislature after the date of their incarceration violated the *ex post facto* clause.[17]  The Second Circuit rejected their claim, stating that the *ex post facto* clause "does not apply to guidelines that do not create mandatory rules for release but are promulgated simply to guide the parole board in the exercise of its discretion." *Barna*, 239 F.3d at 171 (citing *DiNapoli v. Northeast Regional Parole Commission*, 764 F.2d 143, 145-47 (2d Cir.) ("[U]nder this court's precedents the federal parole guidelines applied to appellant are not 'laws' within the meaning of the *ex post facto* clause . . . .") (citing *Priore v. Nelson*, 626 F.2d 211, 217 (2d Cir. 1980); *Shepard v. Taylor*, 556 F.2d 648, 654 (2d Cir. 1977) (*dictum*)), *cert. denied*, 474 U.S. 1020 (1985). "Such guidelines," the *Barna* court stated, "'are not "laws" within the meaning of the *ex post facto* clause.'" *Id.* (citing *DiNapoli*, 764 F.2d at 147; *Beltempo v. Hadden*, 815 F.2d 873, 875 (2d Cir.1987) (quoting *DiNapoli*, 764 F.2d at 147 (quoting *Ruip v. United States*, 555 F.2d 1331 (6th Cir. 1977) ("The[] [federal parole] guidelines are not law, but guideposts which assist the Parole Commission . . . in exercising its discretion. Nor do these guidelines have the characteristics of law. They are not fixed and rigid, but are flexible. The Commission remains free to make parole decisions outside of these guidelines."). That was essentially the extent of the court's *ex post facto* analysis in *Barna*.

*Barna* thus forecloses the possibility of relief on Robles' *ex post facto* claim in this case,

---

[17]     Although the *Barna* opinion does not explicitly reference the new and old parole procedures at issue, it presumably is referring to Corr. Law § 213 and Exec. Law § 259-i.

given that the Second Circuit has explicitly rejected the notion that New York State's parole guidelines constitute "laws" within the meaning of the *ex post facto* clause. The Court thus is constrained to agree with respondent that Robles' claim under the *ex post facto* clause (Ground One) does not provide a basis for habeas relief. Accordingly, it is denied.

### C.     Violation of the Right to Equal Protection of the Laws (Ground Three)

Ground Three of Robles' petitioner is "Equal Protection Violations." *See* Pet. at 8, ¶22C (Docket No. 1). In support of this ground, Robles states that "a special interest group has demanded and received action by the state to deny petitioner release to parole that was available to other individuals under the statutes[,] policies and procedures in effect when petitioner was arrested, convicted and sentenced." *Id.* (Docket No. 1). Thus, Robles appears to attempting to state a claim that he was treated differently than similarly situated inmates. In addition, in his Supplemental Memorandum of Law, Robles claims that prisoners evaluated under former Correction Law § 213 had a 75.4% change of being paroled and that under Governor Pataki's administration, parole for inmates convicted of murder is "down to 3%."

Respondent argues that Robles "has failed to substantiate the factual allegations underlying his Equal Protection claim[.]" Resp't Mem. at 29. For that reason alone, respondent argues, this Court should dismiss Robles' equal protection claim. *Id.* (citing *Morel v. Thomas*, No. 02 CV 9622(HB), 2003 U.S. Dist. LEXIS 10935, at *20 (S.D.N.Y. June 26, 2003) (rejecting habeas petitioner's Equal Protection Claim, in part because of the "lack of substantive proof" for the allegations underlying the claim); *see also Brown v. Thomas*, No. 02 Civ. 9257(GEL), 2003 WL 941940, at *2 (S.D.N.Y. Mar. 10, 2003) ("Brown's equal protection claim . . . asserts that

the Board in fact has granted parole to offenders convicted of first-degree manslaughter, but arbitrarily rejected Brown's application. But Brown's petition and supporting papers are insufficient to establish a denial of equal protection. He does not claim that the Board acted on the basis of any suspect classification or invidious motive. Brown simply asserts that three others convicted of manslaughter have been released on parole, including individuals whose prior records were worse than his. But the number and variety of factors bearing on the seriousness of the underlying offense and the likelihood that an offender will be a danger to the community make it impossible to conclude, on the basis of the sketchy data presented, that petitioner has been singled out from among all homicide offenders for disparate treatment.").

Respondent argues that even accepting Robles' factual allegations as true, his equal protection claim lacks merit. Resp't Mem. at 29. The Equal Protection Clause of the Fourteenth Amendment requires that all persons treated similarly should be treated alike. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). "Unless a classification trammels fundamental personal rights or is drawn upon inherent suspect distinctions such as race, religion, or alienage," the courts must presume that the distinctions made are constitutional as long as they are "rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlen Assoc. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2000) (citing *LeClair v. Saunders*, 627 F.2d 606, 608-10 (2d Cir. 1980)). In *Village of Willowbrook v. Olech*, 528 U.S.

562 (2000) (*per curiam*), the Supreme Court affirmed the validity of such "class of one" claims "where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564. To prevail on a "class of one" equal-protection claim, plaintiff must "show, not only 'irrational and wholly arbitrary' acts, but also intentional disparate treatment." *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir.2001) (quoting *Olech*, 528 U.S. at 564); . As respondent points out, Robles does not allege that his equal protection rights derive from membership in a suspect class.[18] Rather, his claim is based on his being a "class of one." *Id.*

The Court agrees with respondent that, on the present record, Robles has failed to demonstrate that he was treated differently from similarly situated inmates. The groups of prisoners against which Robles compares himself are (1) prisoners who were evaluated under New York's former parole statute, Corr. Law § 213; (2) prisoners who committed crimes other than murder; and (3) prisoners who had received less than the maximum hold-time of 24 months between parole denials. However, Robles is not similarly situated to individuals in these groups. First, Robles was never evaluated for parole-release under former Corr. Law § 213. Second, Robles was convicted of murder. And third, respondent has explained that Robles consistently received the maximum hold-time of 24 months. Resp't Mem. at 30 n.6.[19] Moreover, New York

---

[18]     "[M]erely being a prisoner is insufficient to place [one] in a suspect class." *Defino*, 2003 WL 40502, at *4 (citing *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997) (stating that "neither prisoners nor indigents are a suspect class"); *Carbonell v. Acrish*, 154 F. Supp.2d 552, 561 (S.D.N.Y. 2001) ("The parties agree, and the Court holds, that because prisoners are not a suspect class and the PLRA's attorneys' fee restrictions do not violate any fundamental right, the PLRA fee cap provisions are judged under the rational basis review standard.")).

[19]     After the November 1986 parole denial, Robles was "held" for only two months, but that hold was pending a psychiatric evaluation. Resp't Mem. at 30 n.6. Although he was held for only 18 months in November 1992, the six-month balance of that hold period was made up at a later time. *Id.* (citing Resp't Ex. CC at 2).

state law specifically permits the input of victims and the victims' representatives to appear and be heard at parole hearings. Because Robles has failed to demonstrate the that he was similarly situated to others but received different treatment from those persons, he cannot establish this required element of a "class of one" claim. A successful claim under the "class of one" theory requires a showing that (1) the claimant was similarly situated to others and received different treatment from those persons; (2) "'irrational and wholly arbitrary acts,'" and (3) "'intentional disparate treatment.'" *Defino v. Thomas*, 2003 WL 40502, *4 (S.D.N.Y. Jan. 2, 2003) (quoting *Giordano v. City of New York*, 274 F.3d at 750-51 and citing *Barstow v. Shea*, 196 F. Supp.2d 141, 148 (D. Conn. 2002)). "The failure to allege treatment different from a similarly situated class is fatal to an equal protection claim." *Assoko v. City of New York*, Nos. 1:06-cv-11414-RJH, 1:05-cv-10760-RJH, 2009 WL 1108745, at *4 (S.D.N.Y. Apr. 24, 2009) (citing *Village of Willowbrook v. Olech*, 528 U.S. at 564). For this reason, Robles' equal protection claim cannot succeed.

## IV.      Conclusion

For the foregoing reasons, the Court is constrained to conclude that petitioner Richard Robles has not demonstrated that the Parole Board's decision were contrary to, or an unreasonable application of, clearly established Supreme Court precedent, as this Court understands it. Accordingly, the petition is dismissed.

However, the Court notes the apparent struggle that other district courts in this Circuit have faced in addressing claims similar to those pressed by Robles–namely, where the Parole Board has repeatedly denied parole based solely on the nature of the inmate's offense of

conviction, which, given the numerous other factors that the Parole Board is required to consider, strongly suggests an arbitrary, pre-determined result. The length and detail of the district courts' opinions belie the contention that these inmates' claims are easily dismissed. Robles' case, in particular, presents a clear case of the Parole Board acting in an arbitrary and capricious manner, and, in this Court's opinion, in violation of New York State law.

Title 28 of the United States Code, Section 2253(c)(2) provides that a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The habeas petitioner must demonstrate "that the issues [in the appeal] are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983).The Court accordingly grants a certificate of appealability on the following issues: (1) whether it correctly concluded that Correction Law § 213 does not apply to Robles' case; (2) did Correction Law § 213 create a liberty interest in parole; (3) whether, as some district courts and Circuit courts have held, inmates have a due process right not to be denied parole for arbitrary or impermissible reasons, and to be protected from flagrant and unauthorized action by the Parole Board; and if so, (4) was Robles was denied parole for arbitrary or impermissible reasons; and (5) is the available process in New York for reviewing parole denials ineffective to protect the rights of the habeas applicant and therefore futile for purposes of exhaustion.

The Court declines to issue a certificate of appealability on Robles' remaining claims  as petitioner has not made a substantial showing of the denial of a constitutional right.  *See* 28

U.S.C. § 2253(c)(2).

Finally, Robles' pending motion for the appointment of counsel (Docket No. 29) is **granted**, and Criminal Justice Act ("CJA") Panel attorney Robert J. Boyle, Esq., 350 Broadway, Suite 308, New York, New York 10013-3911, is appointed to assist Robles in further proceedings in this matter.

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____

VICTOR E. BIANCHINI

United States Magistrate Judge

Dated: October 13, 2010

Buffalo, New York.